## State *vs.* Nehemiah Harmon.

*Criminal Law—Homicide—Murder—Manslaughter—Malice; Pre-
sumption of—Character evidence; Weight of—Deadly
Weapon—Self-defense—New Trial—Practice—
Evidence—Witness—Expressing Opinion
—Statement of Juror—Impeach-
ing Verdict.*

1. Murder of the first and second degree, manslaughter and malice, defined.

2. Where the killing is admitted and no accompanying circumstances cf justi-
fication appear, the law presumes that it was done with malice aforethought; and in
such case it is incumbent on the prisoner to show such provocation or alleviation as
will suffice in law to rebut malice; unless such provocation or alleviation appears from
the evidence on the part of the State.

3. If death is produced by the use of a deadly weapon, great must be the prov-
ocation to reduce homicide from the grade of murder to the grade of manslaughter.
And if the killing takes place in a fight between the parties, it must be shown from all
the circumstances of the case that it was perpetrated in a transport of passion or in
the heat of blood, and upon sufficient provocation, without malice and without time
for reflection or for the passions to cool.

4. Good character when proved is to be taken in connection with all the other
evidence in the case; and is to be given just such weight, under all the facts and cir-
cumstances of the case, as the jury think it is entitled to.

5. Where one is assaulted upon a sudden affray, and in defense of his person,
where certain and immediate suffering would be the consequence of waiting for the
assistance of the law, and there is no other probable means of escape, he kills the
assailant, he acts in self-defense and is not guilty. But it must be shown that the
slayer was closely pressed by the other party and retreated as far as he conveniently
could, in good faith, with the honest intent to avoid the violence of the assault; or
that he was so situated that he could not safely retreat.

6. In motions for new trials the practice has been to hear the witnesses. The
application is based upon affidavits where matter *dehors* the record is relied upon, but
the evidence before the Court is the evidence of the witnesses themselves.

7. The record of the official Court Stenographer is the best evidence of the dec-
larations of a juror made upon his *voir dire.*

8. Statements made to witnesses by a juror after the verdict was rendered, as to how they rendered their verdict, are not evidence. He cannot impeach his own verdict.

*(April 11, 1902.)*

LORE, C. J., and SPRUANCE and BOYCE, J. J., sitting.

*Herbert H. Ward,* Attorney-General, and *Robert H. Richards,* Deputy Attorney-General, for the State.

*Robert C. White* and *James A. Marsh* for the defendant.

INDICTMENT FOR MURDER OF THE FIRST DEGREE (No. 11, April Term, 1902).

At a court of Oyer and Terminer in and for Sussex County, beginning April 10, 1902, the defendant, a colored boy seventeen years old, was tried for the murder of one William H. Mitchell, a white man, of Indian River Hundred in said county.

It was admitted that the death of Mitchell on the 29th day of January, 1902, resulted from a wound five or six inches wide and about the same depth, inflicted with an axe upon the left shoulder of the deceased by the defendant, on the 28th day of January of the same year.

The State proved that on the date of the infliction of said wound, the deceased and the defendant were cutting wood in the coaling of one Townsend in Indian River Hundred with several others, where, after a quarrel the deceased and the defendant engaged in a fist-fight, in which the latter was knocked down and beaten. That after getting up off the ground and picking up their axes, there was an interval of about seven and one-half minutes in which the two persons were siding along and talking to each other in a tone that was not loud enough for the words uttered to be understood by a person 30 paces away. That the defendant in the meantime was standing chopping lightly on a "rank" of wood with

his axe; and the deceased, if he had his axe, had it resting with the eye upon the ground, but that it could not be seen by reason of a low brush pile nearby. That the deceased then turned slightly around, side to Harmon, and called "Pete" to one Peter R. Warrington who was cutting wood nearby, but before he could say anything else the defendant quickly struck him a stiff arm blow upon his left shoulder with his axe, inflicting the mortal wound. That Harmon snatched his axe out of Mitchell's shoulder and in doing so turned him around. That Mitchell staggered about 115 strides from the spot and dropped to the ground, first remarking, "Pete, he has cut me; I am ruined; and I have got to die." That Harmon remarked, "Die, damn you," and immediately ran away from the scene of the tragedy, being captured the afternoon of the same day at Ellendale in a Queen Anne's R. R. train bound for Baltimore. The dying declaration of the deceased, taken in writing by a Justice of the Peace and signed by the former, was admitted in evidence, and was as follows:

"Realizing that in my condition life is uncertain and the possibility that I may die, I do make this declaration, to wit:

"Myer Harmon and I were in Indian River Hundred, in the coal woods near each other. We had some words. He kept quarreling and talking about me. I quit piling wood and told him if he wanted to fight, we would fight. In the fight I got the better of him. After I got off him he picked up his axe and drew to strike me. I picked up my axe and drew it at him. He said, 'Don't hit me with your axe;' and I said, 'If you won't hit me, I won't hit you.' Harmon said, 'I won't hit you.' We took our axes down, and as I turned my face from him to go back to work, he struck his axe in my shoulder. He had to snatch it two or three times to get it out of my shoulder."

The statement of the defendant, under oath upon the witness stand, as to the facts immediately connected with the homicide, was as follows:

"Me and my father went out in Townsend's coaling to cut

wood; and after I got out there I said to my father, 'I reckon I will go over to Mr. Steele's lot to the fire to get warm. I started across there, and Mr. Wilson called me, and I went across to him and stayed a little while. Then I went over to Mr. Steele's lot and sat down by the fire to whet my axe. While I was over there Willie Joseph came across and asked me to go over to his lot, and I told him all right. I went over there and stayed awhile. After I got over there Mitchell said to Willie Joseph, 'Will, where did you get that thing at?' and I made no answer and I said nothing. I stayed over there a while and helped Willie cut down some trees, and I started back, and when I started to cross Mitchell's lot he picked up his axe and started towards me, and he said, 'Myer Harmon, you God d——n son-of-a-bitch, don't you go across my lot.' I said, 'Why, Henry, I have got to go across here somewhere.' He said, 'God d——n, you, don't you go across my lot or I will knock you in the head with this axe.' I said, 'Very well, I will not go if you don't want me to;' and, I said, 'Henry, what do you want to be cursing me in this way for; what have I ever done to you?' He said, 'God d——n you, you have done enough.' So I halted on the edge and waited, and was kind of chopping on some wood with my axe; and I said to Will Joseph, 'How am I going to get across to my lot? Henry has headed me off and won't let me get across his lot?' And Henry Mitchell said, 'What is that? God d——n your soul, you keep talking about me, I will come across to you.' I said, 'I was not talking about you, but if you want to come across to me you can come.' With that, he picked up his axe and started towards me, and he said, 'Myer Harmon, God d——n your soul, if you want anything out of me, lay down your axe.' And I laid down my axe. And he struck me in the jaw and kind of stunned me, and then he struck me in the eye and knocked me down and beat me in the face. I guess he struck me about a dozen licks. I pushed him off the best way I could, and I got up and we both picked up our axes and stepped towards each other; and he said, 'Myer Harmon, God d——n your soul, don't

you hit me with that axe.' And then I said, 'Don't you hit me.' Then he drew back his axe this way and said, 'You God d——n ginger-bread nigger, if you want anything more out of me I will give it to you;' and he drew back as though he was going to hit me with his axe, and I hit him."

By *Mr. White:*

Q. Was there any time intervening between the time you got up, and when you picked up your axes, and the time when you struck him, as you have stated?

A. No, sir.

Q. You say it was all the one transaction?

A. Yes, sir.

Q. Who grabbed his axe first, you or he?

A. I cannot say; I think we both grabbed our axes at once, and ran right up to each other.

Q. What was the condition of your mind,—were you angry?

A. Yes, sir.

Lore, C. J., charging the jury:

Gentlemen of the jury:—It is not disputed that the death of William H. Mitchell, on the 29th day of January, 1902, resulted from a wound inflicted by the prisoner Nehemiah Harmon. Your inquiry therefore will be, to determine the grade of homicide.

Inasmuch as under this indictment, if the evidence shall so warrant, you may find the prisoner guilty of any one of three grades of felonious homicide, viz., of murder of the first degree, of murder of the second degree or of manslaughter, it becomes necessary for us to define these three offenses for your information.

Murder of the first degree is where the homicide is committed with express malice aforethought; that is, with sedate deliberate mind and formed design to kill.

If the homicide was committed with such sedate, deliberate

mind and formed design, even though such deliberate mind and formed design existed only for a moment, it would be sufficient. "Time is not an essential element of deliberation. If the slayer had time for thought, and thinking but for a minute, did intend to kill, and in fact did kill, it is just the same in legal contemplation as if he had intended it for a length of time ; and killing under such circumstances is held to be both deliberate and premeditated.

*State vs. Pratt, 1 Houst. Crim. Cas., 263.*

Murder of the second degree, is where there is no such sedate, deliberate mind and formed design to take life, but where the circumstances surrounding the case show that the homicide was committed under the influence of a wicked and depraved heart and with a cruel and reckless indifference to human life. In such case the law implies malice, and makes the offense murder of the second degree.

In both degrees of murder, you will note that malice is the essential ingredient. Without malice there can be no murder.

Malice is the expression of a wicked and depraved heart and mind and of a cruel disposition.

Manslaughter is where the homicide is wilful and unlawful, but is committed under such circumstances of provocation or alleviation as to rebut the implication of malice ; as where one in a mutual altercation in the heat of blood, or in a transport of passion upon sufficient provocation, without malice, inflicts a mortal wound without time for reflection or for the passions to cool. Thus far the law recognizes the infirmity of human temper. In all such cases, however, there must be the absence of a deliberate intent to kill ; the killing must result from heat of blood or transport of passion.

Where the killing is admitted and no accompanying circumstances of justification, excuse or mitigation appear, the law presumes that it was done with malice aforethought , and in such case

it is incumbent on the prisoner to show such provocation or alleviation as will suffice in law to rebut malice ; unless such provocation or alleviation appears from the evidence on the part of the State.

*State vs. Frazer, 1 Houst. Crim. Cas., 176.*

If death is produced by the use of a deadly weapon, great must be the provocation to reduce the homicide from the grade of murder to the grade of manslaughter.

*State vs. Hurley, Ibid, 28.*

If such killing takes place in a fight between the parties, it should be shown from all the circumstances of the case that it was perpetrated in a transport of passion or in the heat of blood and upon sufficient provocation, without malice and without time for reflection or for the passions to cool.

In determining the guilt or innocence of the prisoner you are to be governed only by the evidence in this case.

Good character when proved is to be taken in connection with all the other evidence in the case, and is to be given just such weight, under all the facts and circumstances of the case, as in your judgment it is entitled to.

Every person is presumed to be innocent of the crime charged until proven guilty.

It is incumbent on the State to prove every material element of the crime charged.

In murder, malice is a material element, and must be proved beyond a reasonable doubt. It may be proved, however, by any and all the circumstances surrounding the case which show that the act complained of was intentional, and the outcome of a cruel and depraved heart, and was wilfully and recklessly done.

If after a careful and conscientious consideration of all the evidence in this case, there remains in your mind a reasonable

doubt of the proof of any of the material elements of the crime charged, you should give the benefit of such doubt to the prisoner. It must, however, be a reasonable doubt, growing out of all the circumstances of the case as disclosed by the evidence, and such as would prevent reasonable and conscientious men from reaching a conclusion to a moral certainty. It must not be a fanciful doubt, or one growing out of conjecture, speculation or sympathy.

Under these instructions upon the law, you are to determine upon your verdict.

If you believe from the evidence, that the prisoner killed the deceased with sedate, deliberate mind and formed design, then your verdict should be guilty in manner and form as he stands indicted.

If, however, you believe that he did not so kill the deceased, but that the mortal blow was inflicted by him cruelly and reck-lessly, under the influence of a wicked and depraved heart, with indifference to human life, the law would imply malice; and your verdict should be not guilty in manner and form as he stands indicted, but guilty of murder of the second degree.

If you believe that the mortal blow was not inflicted in self-defense, but was inflicted unlawfully and without malice, then your verdict should be not guilty in manner and form as he stands indicted, but guilty of manslaughter.

If you should believe that the prisoner killed the deceased in self-defense, then your verdict should be not guilty. Such a verdict may be found where one is assaulted upon a sudden affray, and in defense of his person, where certain and immediate suffering would be the consequence of waiting for the assistance of the law, and there is no other probable means of escape, he kills the assail-ant. But it must be shown that the slayer was closely pressed by the other party and retreated as far as he conveniently could, in good faith, with the honest intent to avoid the violence of the assault; or that he was so situated that he could not safely retreat.

*State vs. Rhodes, 1 Houst. Crim. Cas., 499.*

Verdict, guilty.

## MOTION FOR NEW TRIAL.

Counsel for defendant made a motion for a new trial, basing same upon the following grounds :

"*First.*—For that said verdict was against the evidence.

"*Second.*—For that said verdict was against the law.

"*Third.*—For that the said verdict of guilty was not the voluntary and honest verdict of William T. Green, Frank Hatfield and George Ray, three of the jurors who were sworn and empanelled to try said issue.

"*Fourth.*—For that William T. Green, Frank Hatfield and George Ray, three of the jurors who were sworn and empanelled to try said issue were induced to agree to a verdict of "Guilty" upon a promise by other members of the said jury that they would assume all responsibility to Almighty God for the act of the said William T. Green, Frank Hatfield and George Ray in violating their conscientious convictions by agreeing to a verdict of guilty as aforesaid.

"*Fifth.*—For that Enoch. C. Truitt, a juror who was sworn and empanelled to try said issue, when sworn upon his *voir dire* deposed and said "that he had not formed and expressed any opinion with reference to the guilt or innocence of the prisoner at the bar, when in fact he had formed and expressed the opinion that the said Nehemiah Harmon was guilty of murder of the first degree and should be hanged."

The above motion was supported by one or more affidavits.

*Mr. White:*—I understand this motion will be disposed of entirely upon affidavits filed and that no testimony will be taken.

LORE, C. J.:—The practice has been to hear the witnesses. You base your application upon affidavits where you rely upon matters *dehors* the record, but the evidence before the Court is the evidence of the witnesses themselves.

(*Mr. White* here called one Robert Short as a witness, stating that he proposed to prove by him that Enoch C. Truitt, one of the jurors in the case, had declared upon his *voir dire* that he had not expressed and formed any opinion as to the guilt or innocence of the defendant Harmon).

*Mr. Ward :*—I object to the witness testifying on that point, inasmuch as we have a record made by the official stenographer which is the best evidence.

(The Court Stenographer, at the request of the Court read the testimony of said Truitt on his *voir dire* to the effect that he had not formed and expressed any opinion regarding the guilt or innocence of the prisoner at the bar).

*Joseph S. Baker* was produced and asked the following questions :

Q. Do you know Enoch C. Truitt ?   A. Yes, sir.

Q. How long have you known him ?   A. I suppose I have known him 15 years.

Q. Did you or not see him on the jail premises last week, and, if so, what day of last week ?   A. He was in there on Monday of last week, sometime in the day ; that is, on the day the Court sat.

Q. What was he doing there ?   A. I do not know what took place in there.   He most always comes in there to see me most every time he comes to Georgetown.

Q. Did you have any conversation with him or he with you in relation to the trial of Nehemiah Harmon ?   A. Yes, sir ; there was something said about it.

Q. What did he say about it as to his guilt or innocence ?   A. The talk he had with me was, that the way the people talked he thought Nehemiah Harmon would be hanged.

Q. Did he say anything about his verdict ?   A. No, sir.

Q. But that was the substance of it? A. Yes, sir; that was just about what was said.

(The Attorney-General moved to strike out all of the above testimony as immaterial, as it showed that the juror had not expressed any opinion).

LORE, C. J.:—Let the testimony stand. It will be subject to your cross-examination.

### CROSS-EXAMINATION.

By *Mr. Ward:*

×Q. What did Enoch C. Truitt say to you in jail? A. That was not in the jail but in the jail premises. He said from the way people talked that he thought Nehemiah Harmon would be hanged.

×Q. What else did he say? A. That was about all there was that passed between me and Mr. Truitt on that subject.

(*Mr. White* next produced James H. Wright, Clerk of the Peace, and stated that he proposed to prove by the witness, statements which were made by one of the jurors after the verdict was rendered as to how they rendered their verdict.

LORE, C. J.:—Impeaching his own verdict?

*Mr. White:*—Statements he made. I know the juror could not be sworn and allowed to impeach his own verdict, but I have authority here upon which I rely.

*Vase vs. Deleval, 1 Term Reports.*

LORE, C. J.:—Can you find a case where the Court have allowed a statement impeaching the verdict of the jury?

*Mr. White:*—I cannot, but I have found a case where they have simply refused to take the statements of jurors themselves.

LORE, C. J. :—If this were allowed, all a juror would have to do if he wanted to have a verdict set aside would be to say to somebody else that it was found irregularly. It would put the verdict of a jury entirely in the hands of one juror.

*Thompson and Mirriam on Juries, Sec. 445, p. 547.*

Statements made to witnesses by jurors are not received in evidence.

We decline to hear this witness upon that point.

*James H. Speakman,* a witness, was questioned by Mr. White as follows :

Q. Do you know Enoch C. Truitt? A. Yes, sir.

Q. Did you see him on the first or eighth of April of this year? A. Yes, sir.

Q. Did you have any conversation in his presence in relation to the Nehemiah Harmon matter? A. Yes, sir.

Q. State what he said to you and give the whole conversation. A. Several times persons have asked me what I thought of the murder case—don't know whether it was Monday or Tuesday of last week—anyhow they asked me about this murder case. I told them that if the evidence was like it was at the Coroner's inquest I did not see why they should not find him guilty.

Q. Who was present? A. A dozen or more.

Q. Was Enoch C. Truitt present? A. Yes, sir ; but Enoch C. Truitt said nothing ; and I can't say who was present by name, because then I did not know even the jurors' names.

By CHIEF JUSTICE LORE :

Q. He did not make any statement? A. No, sir ; I would not say that he did.

By JUDGE SPRUANCE:

Q. Neither then nor at any other time before this trial? A. No, sir; not to me.

Q. Or in your presence? A. No, sir.

*Mr. White:*—That is all of our testimony. We will close here.

*Mr. Ward:*—Does the Court desire our affidavits to be filed?

LORE, C. J.:—No.

(After argument by the respective counsel, the Court rendered the following opinion and decision):

LORE, C. J.:—The Court have considered this motion for a new trial and the evidence offered in support thereof. Proof as to improper conduct on the part of the jury, or any of them, having entirely failed, the Court were left to the consideration of whether the verdict was clearly and manifestly against the law and the evidence, under the rules and practice of this Court. After carefully considering it, we do not think that that is so cleary shown that we could depart from the well established rule governing the Court in this case, and we are therefore compelled to refuse the motion for a new trial.