**Ernest V. WATERS, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted Sept. 21, 1981.

Decided March 11, 1982.

---

6. See *State v. Wright, supra,* for discussion of child support actions under the earlier Bastardy

Act as "quasi-criminal".

Dennis A. Reardon (argued), Asst. Public Defender, Dover, for defendant-appellant.

Dana C. Reed (argued), Deputy Atty. Gen., Dover, for plaintiff-appellee.

Before HERRMANN, C. J., DUFFY and HORSEY, JJ.

HERRMANN, Chief Justice:

In this appeal the defendant seeks reversal of his conviction of Murder in the Second Degree [11 *Del.C.* § 635(1)][1] on the grounds that (1) the Statute is unconstitutionally vague; (2) there was error in the jury charge; and (3) the evidence was insufficient to sustain a conviction of Murder in the Second Degree. Collaterally, he argues that the imposition of separate, consecutive sentences—one for Murder in the Second Degree and one for Possession of a Deadly Weapon During the Commission of a Felony[2]—violates his rights under the Double Jeopardy Clause in that he is thereby subjected to multiple punishment for the same offense.

I.

The defendant was arrested as a result of the following events:

---

1.  11 *Del.C.* § 635(1) provides:
    "§ 635.  Murder in the second degree; class A felony.
    "A person is guilty of murder in the second degree when:
      "(1) He recklessly causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life;"

2.  Defendant was convicted under 11 *Del.C.* § 1447(a) which reads:
    "§ 1447.  Possession of a deadly weapon during commission of a felony;  class B felony.
      "(a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony."

Having driven his car to a private social club to meet a friend, the victim, Earl Pope, parked on the street, partially blocking the defendant's driveway. The defendant called out to the victim to move the car; the victim refused, saying he would only be there a few minutes. An argument ensued whereupon obscenities and other "fighting" words were exchanged. The victim then went to his car, opened the trunk and, appearing to remove something,[3] went to meet his friend who was waiting across the street. In the meantime, the defendant went into his house.

While the victim and his friend were talking on the sidewalk, a shot rang out; the victim fell to the ground wounded in the chest; he was taken to the hospital where he was pronounced dead on arrival. Witnesses observed the defendant standing on his porch step holding a .12 gauge shotgun aimed in the direction of the victim. They identified the defendant to the police, upon the latter's arrival at the scene, as the person who fired a shotgun at the victim.

The defendant's wife admitted to the police that her husband owned a shotgun and consented to a search of their home. The search revealed a .12 gauge shotgun containing one fired and one unfired cartridge. Police testimony revealed that when they opened the gun, "smoke issued from the barrel," indicating it had been recently fired.

The defendant, having been arrested prior to the search based on witness-identification, was transported to police headquarters. During the drive, a conversation took place between the arresting officer and the defendant as related by the officer's testimony:

"Q. Did you have a conversation with the defendant on the way back to the Dover Police Station?

"A. Yes, I did.

"Q. Would you indicate to the jury what you said and what he said.

"A. On the way back I stated, I said, 'Must have been quite an argument' and the defendant stated that he was tired of people parking in his driveway and that he had told Mr. Pope to move his car and Mr. Pope said he would in a minute and the defendant apparently said he wanted it moved right then and the defendant told me, 'We got in an argument.' The defendant said, 'He went over to his trunk so I went in my house and got mine. Got him before he got me.'

"Q. What did you say at that point?

"A. I asked him was he referring to a weapon. I said, 'What did you do? Shoot him?' and the defendant said, 'Well, I got mine and I did it to him before he did it to me.'"

The defendant was indicted for Murder in the First Degree under 11 *Del.C.* § 636(a)(1)[4] and Possession of a Deadly Weapon During the Commission of a Felony. At trial, the Judge instructed the jury on the lesser offenses of Murder in the Second Degree and Manslaughter [11 *Del.C.* § 632(1)].[5] The jury returned verdicts of guilty of Murder in the Second Degree and Possession of a Deadly Weapon.

## II.

The basic difference between Manslaughter and Murder in the Second Degree, under the governing Statutes, is that the latter requires a showing that the homicide was committed "under circumstances which manifest a cruel, wicked and depraved in-

3. According to the record, the defendant told police that he knew the victim to be a State Correctional System officer who possessed a gun and that he believed the victim to be getting the gun from the trunk.

4. 11 *Del.C.* § 636(a)(1) provides:
  "§ 636. Murder in the first degree; class A felony.
  "(a) A person is guilty of murder in the first degree when:

  "(1) He intentionally causes the death of another person;"

5. 11 *Del.C.* § 632(1) provides:
  "§ 632. Manslaughter; class B felony.
  "A person is guilty of manslaughter when:
    "(1) He recklessly causes the death of another person;"

difference to human life," while the former does not. Both offenses require a "reckless" state of mind. Along these lines, defendant's argument is two-fold:

First, it is contended that in a death penalty murder context, the United States Supreme Court recently found the statutory language "outrageously or wantonly vile, horrible and inhuman" to be unconstitutionally vague. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).[6] Defendant argues that the statutory words "cruel, wicked and depraved indifference to human life," as used in § 635(1), are likewise unconstitutionally vague in that they fail to provide the jury with sufficiently clear guidelines to use in arriving at their verdict.

Second, it is asserted that in charging the jury on Murder in the Second Degree and Manslaughter, the Trial Court committed reversible error in failing to give definitive instructions as to the meaning of "cruel, wicked and depraved indifference to human life", thereby leaving the jurors without sufficient objective standards to guide them in distinguishing between the elements of Manslaughter and Murder in the Second Degree.[7]

---

**6.** The Supreme Court there stated:

"In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation." 446 U.S. at 428–9, 100 S.Ct. at 1765.

**7.** Relevant portions of the charge to the jury were as follows:

"If you find the defendant not guilty of murder in the first degree, you may then consider the lesser included charge of murder in the second degree. In order to find the defendant guilty of murder in the second degree, you must find that all the following elements have been established beyond a reasonable doubt:

"1. The defendant caused the death of Earl Pope, Jr. By this I mean the defendant by his own voluntary act must have brought about this death which would not have happened but for such act.

"2. The defendant acted recklessly. A person acts recklessly with respect to death when he is aware of and consciously disregards a substantial and unjustifiable risk that death would result from his conduct. The risk must be of such nature and degree that the defendant's disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in this situation.

"In order to convict the defendant of murder in the second degree, you must find the defendant was aware of and consciously disregarded the risk that his conduct would cause death and also that the risk was so great that a reasonable person under the circumstances would have acted otherwise to avoid the risk.

"3. The defendant's recklessness was such as to manifest a cruel, wicked and depraved indifference to human life.

"If, after considering all the evidence, you find the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all the elements which I have just stated, at or about the date and place stated in the indictment, you should find the defendant guilty of murder in the second degree. If you do not so find, you should find the defendant not guilty of murder in the second degree.

"If you find the defendant not guilty of murder in the first degree or in the second degree, you then may consider the charge of manslaughter. In order to find the defendant guilty of manslaughter, you must find that all the following elements have been established beyond a reasonable doubt:

"1. The defendant caused the death of Earl Pope, Jr. By this I mean the defendant by his own voluntary act must have brought about this death which would not have happened but for such act.

"2. In causing this death, the defendant must have acted recklessly. A defendant acts recklessly with respect to death when he is aware of and consciously disregards a substantial and unjustified risk that death would result from his conduct. The risk must have been of such nature and degree that defendant's disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would have observed in this situation.

"In order to convict the defendant of manslaughter, you must find the defendant was

As indicated, the defendant relies upon *Godfrey v. Georgia, supra,* in support of his constitutional attack, and supplements that reliance with *State v. Chaplin,* Del.Super., 433 A.2d 327 (1981).

Following the rationale of *Godfrey,* the Superior Court in *Chaplin,* struck down as unconstitutionally vague the aggravating circumstances provision in Delaware's present Capital Punishment Statute, 11 *Del.C.* § 4209(e)(1)(n), which reads: "The murder was outrageously or wantonly vile, horrible or inhuman." Upon the authority of *Godfrey,* this Court affirmed. *Petition of State For Writ,* Del.Supr., 433 A.2d 325 (1981).

While the idea of extending the *Godfrey* rationale to "cruel, wicked and depraved indifference to human life," is at first blush appealing, we nevertheless decline to make that extention. The "aggravating circumstance" words at issue in *Godfrey* and *Petition of State For Writ* were intended to define the "enormity" of a murder sufficiently to justify the death penalty. Because "[a] person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly, vile, horrible and inhuman,' " *Godfrey,* 446 U.S. at 428, 100 S.Ct. at 1765, the risk of an arbitrary "selective and irregular" use of the death penalty became too great. *Furman v. Georgia,* 408 U.S. 238, 242, 92 S.Ct. 2726, 2728, 33 L.Ed.2d 346 (1972).

In the present case, on the other hand, the words "cruel, wicked, and depraved indifference to human life," are intended to define a particular state of mind which must be found to have existed in the defendant at the time the crime was committed—the *mens rea.* Since that language is not defined in our Criminal Code, the words in question are to be given their "commonly accepted meaning," 11 *Del.C.* § 221(c).[8] In order to avoid the objectionable vagueness inherent in the language, the Trial Court should have charged the jury accordingly.

The Commentary to the Criminal Code makes clear that the drafters of the Code relied heavily on long-standing precedent in arriving at the wording of the Murder Two Statute. The Commentary states that the terms "intentionally" and "recklessly" were used in the present Statute in place of the common law concept "malice aforethought" which was "scrapped as too ambiguous and difficult to explain to jurors." Delaware Criminal Code with Commentary (1973), 191. Nevertheless, that the present § 635 was intended to embrace common law concepts is borne out by the Commentary at 191–192.

"Subsection (1) covers reckless killing which is distinguished from manslaughter by 'circumstances which manifest a cruel, wicked, and depraved indifference to human life.' This is not unlike the former law which, by use of the concept of 'im-

aware of and consciously disregarded the risk that his conduct would cause death and also that the risk was so great that a reasonable person under these circumstances would have acted otherwise to avoid the risk.

"If, after considering all the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all the elements which I have just stated, at or about the date and place stated in the indictment, you should find the defendant guilty of manslaughter. If you do not so find, you should find the defendant not guilty of manslaughter.

\* \* \* \* \* \*

"Now, I wish to define for you several terms that I used in defining these charges.

"The first is that of intentionally. A person acts intentionally with respect to causing the death of another person when it is his con-

scious object or purpose to achieve such a result.

"The definition of the term recklessly is a person acts recklessly with respect to causing the death of another person when he is aware of and consciously disregards a substantial and unjustifiable risk that such death would result from his conduct. The risk must be of such a nature and degree that the defendant's disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in this situation. \* \* \*."

8. 11 *Del.C.* § 221(c) provides:

"§ 221. Principles of definitions.

\* \* \* \* \* \*

"(c) If a word used in this Criminal Code is not defined herein, it has its commonly accepted meaning, and may be defined as appropriate to fulfill the purposes of the provision as declared in § 201 of this title."

plied malice' treated the most aggravated reckless killings as second-degree murder. It will be a jury question in each case whether a killing is so serious in its circumstances to amount to second-degree murder, or is only manslaughter. The distinction is one of degree only. The decision turns on the actor's conduct. The State will need to prove precisely what the defendant did which supports its contention that his attitude to human life was 'cruel, wicked, and depraved.' His own words would be relevant, as would his choice of a particular *modus operandi* or a particular weapon. The State must also prove that he was 'reckless' with regard to death. That is, he must have perceived and consciously disregarded a substantial and unjustifiable risk that death would be caused by his conduct—a risk that constitutes a 'gross deviation' from a reasonable standard of conduct, in the light of all the surrounding circumstances, including the purposes of his activity."

With the reference in the Commentary to "implied malice" clearly in mind, we look, as the Trial Court should have, to longstanding precedent in this State for the adequate jury instruction in this case.

This Court, in *Brinkley v. State*, Del. Supr., 233 A.2d 56, 58 (1967), ruled that "a cruel, wicked and depraved indifference to human life" could be found where the "intentional acts [of the defendant] were so fraught with danger . . .—so likely to cause death or great bodily harm . . . ." *Accord, Hallowell v. State*, Del.Supr., 298 A.2d 330 (1972).

The Commentary relies heavily on the case of *State v. Winsett*, Del.Super., 205 A.2d 510, 515–516 (1964) wherein the Court in instructing the jury offered the following:

" . . . malice includes all acts done voluntarily and with a wilful disregard for the rights and safety of others. Malice, therefore, is a condition of mind or heart, existing at the commission of the fatal act; it includes that general reckless disregard of human life which proceeds from a heart and mind void of a just sense of social duty and fatally bent on mischief . . . .

"Implied or constructive malice must be shown by the character of the fatal attack and the surrounding circumstances. Where there is proved no fact or circumstance indicating that the accused acted with a sedate and deliberate mind, yet where the fatal act was unlawful and cruel and voluntarily committed, without adequate provocation, and in circumstances showing a wicked indifference to human life or with a reckless disregard of the consequences, the law implies or infers malice . . . .

"Murder in the second degree is where the killing is done, not with express malice, but, rather, with implied or constructive malice, that is, where the malice is inferred from facts actually proved. Malice is implied by law from every intentional cruel act committed by one person against another, however, sudden the act may be. The law considers that he who commits a cruel act voluntarily, does it maliciously. Every person is presumed to contemplate and intend the natural and ordinary consequences of his own voluntary act; if the act, voluntarily and wilfully done, has a direct tendency to destroy the life of another, the natural conclusion from the fact is that the destruction of the person's life was intended.

"Murder in the second degree, therefore, is where the killing is done without the premeditation or deliberate mind required to make the act murder in the first degree, but nevertheless is done without justification or excuse, and without adequate provocation, and with a wicked and depraved heart, or with a cruel and wicked indifference to human life. In such case the law implies malice."

Language comparable to that of *Winsett* can be found in *State v. Lee*, Ct. of O. & T., 171 A. 195 (1933) and in *State v. Harmon*, Ct. of O. & T., 60 A. 866 (1903). *Harmon* also points out that one reason for degrees of homicide is to permit recognition of "the

infirmity of human temper" where no deliberate intent to kill exists. 60 A. at 869. And Black's Law Dictionary 528 (4th Ed. 1968) defines a "Depraved mind" as one having "[a]n inherent deficiency of moral sense and rectitude."

■ Clearly, then, the words "cruel, wicked and depraved indifference to human life" are words with a commonly accepted meaning, time-honored in this State's jurisprudence. Over the years, instructions similar to those found in *Winsett* have been given to innumerable juries in this State. Apparently, they have been able to understand and apply the concepts inherent therein to the facts before them. With this long history in mind, we find no vagueness problem, rising to constitutional levels, created by the instant language.

■ However, as indicated, we find a serious problem in the Trial Court's failure to attempt any definition or clarification of the statutory language for the jury's benefit in this case. The Trial Court made no attempt to define the constitutionally borderline language of § 635(1); it merely read the words of the Statute to the jury. No attempt was made in the jury charge to distinguish "reckless" as it relates to Murder in the Second Degree from "reckless" as it relates to Manslaughter; nor to explain the meaning of the words "cruel, wicked and depraved indifference to human life." Considering the careful language of cases such as *Winsett* and *Harmon*, above noted, the Trial Court was remiss in not having given a more complete charge in these respects.

The difference between Murder Two and Manslaughter hangs upon the statutory language here in question. In differentiating between the two offenses, the jury indirectly became involved in the sentencing process—this because the statutory penalty for Murder Two is life imprisonment and for Manslaughter 3 to 30 years, 11 *Del.C.* § 4205.

We hold, therefore, that it was plain and reversible error not to charge the jury as to the commonly accepted meaning of the brief language of § 635(1) under which this defendant was convicted.

The maximum benefit to the defendant of this ruling under the facts of this case would be reduction of his conviction to Manslaughter and resentencing thereon. The State, however, may elect to retry the defendant for Murder Two or to accept the entry of a judgment of conviction of Manslaughter. *Oney v. State*, Del.Supr., 397 A.2d 1374 (1979).

Accordingly, the judgment below is reversed and the case will be remanded for a new trial unless, within 10 days of the issuance of this opinion, the State files in this Court an election to modify the judgment of conviction to the lesser offense of Manslaughter. In the latter event, the cause will be remanded for modification of the judgment of conviction to Manslaughter and imposition of sentence thereon. *Oney, supra*, at 1376–77.

\* \* \*

■ This decision will be given prospective application only, the determinative date being the date of publication of this opinion: March 11, 1982. This decision will apply only to: (1) this case; (2) any case now pending on appeal to this Court; (3) any other case tried prior to March 11, 1982, which has not yet been appealed but which may be eligible for direct appeal to this Court; and (4) any trial commenced after March 11, 1982, *Fuentes v. State*, Del.Supr., 349 A.2d 1, 7–8 (1975), rev'd on other grounds, *State v. Moyer*, Del.Supr., 387 A.2d 194 (1978).

### III.

■ Following the now well-established rule, we hold that the Trial Court did not and will not err, or violate the defendant's guarantee against double jeopardy, by imposing separate and consecutive sentences upon the convictions for both Possession of a Deadly Weapon during the Commission of a Felony and the underlying Felony. *Hunter v. State*, Del.Supr., 430 A.2d 476 (1981); *Evans v. State*, Del.Supr., 430 A.2d 481 (1981).

\* \* \*

Reversed and remanded for further proceedings consistent herewith.