# IN THE SUPREME COURT OF THE STATE OF DELAWARE

THEOPALIS K. GREGORY, §
§
Defendant Below, §
Appellant, § No. 85, 2022
§
v. § Court Below: Superior Court
§ of the State of Delaware
STATE OF DELAWARE, §
§ Cr. ID No. 1909016095(N)
Appellee. §

Submitted: January 18, 2023
Decided: March 7, 2023

Before **SEITZ**, Chief Justice; **VAUGHN** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

E. Calvin Harmon Jr., Esquire, Brett Bendistis, Esquire (*argued*), Wilmington, Delaware, *for Defendant Below, Appellant Theopalis K. Gregory*.

David C. Skoranski, Esquire, Delaware Department of Justice, Wilmington, Delaware, *for Appellee State of Delaware*.

**SEITZ**, Chief Justice:

A New Castle County grand jury indicted Theopalis Gregory, a former City of Wilmington Council President and Delaware lawyer, for official misconduct and profiteering. The charges stemmed from a $40,000 discretionary grant Gregory earmarked for his non-profit organization before leaving office. He personally received at least $15,000 of the grant after he left office. A Superior Court jury convicted Gregory of one count of official misconduct.

On appeal, Gregory argues that the jury instructions were flawed because the trial judge did not define for the jury "official functions," a necessary element of an official-misconduct conviction. He also argues that the evidence at trial was insufficient to support his conviction because he was not performing official functions when he earmarked funds for his nonprofit.

We affirm Gregory's conviction. Gregory did not object to the jury instructions. Thus, we review only for plain error. The trial judge did not plainly err when he instructed the jury using the words of the statute. And we are satisfied that the jury had more than sufficient evidence to find that Gregory was performing official functions when he earmarked the $40,000.

I.

From January 2013 to January 2017, Gregory served as president of the Wilmington City Council. As president, he had exclusive control over a $250,000

2

taxpayer-funded president grant fund used to award money to qualifying non-profit organizations. After losing the City of Wilmington democratic mayoral primary, and in his waning days as City Council President, Gregory sought to secure funding for his long dormant non-profit organization, Student Disabilities Advocate, Inc. ("SDA"). Gregory revived the dormant organization and identified himself as SDA's president.[1]

On November 10, 2016, Marchelle Basnight, Gregory's deputy chief of staff, emailed Gregory and Hanifa Shabazz, the incoming City Council President, that $43,400 remained in the president grant fund. Gregory replied and informed Shabazz and Basnight that the email "did not make it clear that [$]40,000 of the remaining [$]250,000 is earmarked for SDA."[2] Basnight testified that she understood "earmark" to mean a placeholder.[3]

Following his email, Gregory "questioned Shabazz and Basnight on multiple occasions about the status of the SDA grant proposal."[4] Shabazz testified that she felt pressured by Gregory as she prepared for her new role as City Council President.[5] Gregory admitted that "Shabazz felt 'pressure' and a 'constant push' from [him] about granting the request."[6] At Gregory's direction, Basnight prepared

---

[1] Trial Ex. I. ¶ 5 (Wilmington Ethics Commission Agreed Disposition).
[2] Trial Ex. B (Gregory's email to Basnight and Shabazz).
[3] App. to Opening Br. at A085 (Redirect Examination of Basnight).
[4] Trial Ex. I. ¶ 7 (Wilmington Ethics Commission Agreed Disposition).
[5] App. to Opening Br. at A110 (Direct Examination of Shabazz).
[6] Trial Ex. I. ¶ 7 (Wilmington Ethics Commission Agreed Disposition).

a draft grant application for SDA using documents from Gregory. She sent the application in an email to Gregory and Shabazz. The email set forth the steps Shabazz needed to take to award the grant once she became City Council President.[7] Because SDA lacked IRS-approved non-profit status, Gregory coordinated with the Police Athletic League of Wilmington ("PAL"), an IRS-approved non-profit organization, to secure the grant.[8] PAL agreed to apply for the grant on SDA's behalf.

After Shabazz took office, PAL submitted a $40,000 grant request for the SDA "pilot program."[9] She approved the request. The grant award included in its budget two $20,000 payments, one of which went to SDA's "Program manager/Advocate."[10] Gregory personally received at least $15,000 as SDA's program manager.[11]

After media outlets reported on the grant, the City of Wilmington Ethics Commission opened an investigation.[12] Gregory eventually agreed to a stipulation admitting most of the facts just recited.[13] He also admitted violating City of

---

[7] App. to Opening Br. at A069 (Direct Examination of Basnight); Trial Ex. C (the email with the grant application).

[8] App. to Opening Br. at A073 (Direct Examination of Basnight); Trial Ex. I. ¶ 8 (Wilmington Ethics Commission Agreed Disposition).

[9] Trial Ex. I. ¶ 8 (Wilmington Ethics Commission Agreed Disposition).

[10] *Id.* ¶ 11 (Wilmington Ethics Commission Agreed Disposition).

[11] *Id.* ¶ 14 (Wilmington Ethics Commission Agreed Disposition).

[12] App. to Opening Br. at A145 (Re-cross Examination of Shabazz).

[13] Trial Ex. I. (Wilmington Ethics Commission Agreed Disposition).

Wilmington ordinances, one of which provides that "[n]o elected official … shall utilize the influence of his or her office or position for personal gain, or to unduly influence the behavior of others, or to avoid the legal consequences of his or her personal conduct."[14]

A New Castle County grand jury indicted Gregory for two counts of official misconduct and one count of profiteering. Under 11 *Del. C.* § 1211:

> [a] public servant is guilty of official misconduct when, intending to obtain a personal benefit or to cause harm to another person:
>
> (2) The public servant knowingly refrains from performing a duty which is imposed by law or is clearly inherent in the nature of the office; or
>
> (3) The public servant performs official functions in a way intended to benefit the public servant's own property or financial interests under circumstances in which the public servant's actions would not have been reasonably justified in consideration of the factors which ought to have been taken into account in performing official functions . . . .

Under 11 *Del. C.* § 1212(1):

> A public servant is guilty of profiteering when, in contemplation of official action by the public servant or by a governmental entity with which the public servant is associated, or in reliance on information to which the public servant has access in an official capacity and which has not been made public:
>
> (1) The public servant acquires a pecuniary interest in any property, transaction or enterprise which may be affected by the official action or information….

---

[14] City of Wilmington § 2-340(f)(3).

After the State rested its case at trial, the court granted Gregory's motion to dismiss the profiteering charge. The court reasoned that the state's evidence would not have justified a reasonable jury's finding that Gregory acquired a pecuniary interest in his non-profit required for a profiteering conviction under § 1212(1). At the prayer conference to review the jury instructions, Gregory did not object to the jury instructions and did not request that the trial judge define for the jury the term "official functions." The court charged the jury on the misconduct charge by, for the most part, reading the statute.[15]

The jury acquitted Gregory of one count of official misconduct under § 1211(2) but found him guilty of one count of official misconduct under § 1211(3). In a post-trial motion for judgment of acquittal under Super. Ct. Crim. R. 29(c), Gregory argued that the State and the court failed to define for the jury the term "official functions." He also claimed that there was insufficient evidence to support the jury's finding that he was performing "official functions" when he "earmarked" the $40,000 grant for SDA.

The court denied the motion. It found that the jury correctly decided whether Gregory's actions qualified as "official functions."[16] Relying on 11 *Del.* C. § 221(c), the trial judge reasoned that when the criminal code does not define a word, the jury

---

[15] App. to Opening Br. at A325–26 (Jury Instructions).
[16] *State v. Gregory,* 2022 WL 108536, at *3 (Del. Super. Ct. Jan. 12, 2022).

can use its commonly accepted meaning – conduct that "relate[s] to the job or duty of a person in an office, position, or trust."[17] The court also found that the evidence at trial was sufficient to support the jury's finding that Gregory was performing "official functions" when he earmarked the grant for his non-profit organization. First, the evidence established that, as the City Council President, Gregory had sole discretion over who received money from the discretionary president fund. Second, Gregory was serving as president when he "earmarked" the funds for SDA and pressured Shabazz to approve the grant request. Third, the president fund allocation for the 2017 fiscal year fell to both Gregory and Shabazz because their terms overlapped during the fiscal year. Fourth, Gregory stipulated in the City of Wilmington Ethics Commission proceeding that he questioned Shabazz about the SDA grant proposal on multiple occasions and pressured her about the grant. And finally, he admitted that he instructed his deputy chief of staff to prepare and submit a draft grant application with a list of steps that Shabazz would need to take after assuming office.

## II.

On appeal, Gregory argues that the trial court erred by failing to define official functions in the jury instructions. Under Superior Court Criminal Rule 30, however, "[n]o party may assign as error any portion of the charge or omission therefrom

---

[17] *Id.*

7

unless the party objects thereto before or at a time set by the court immediately after the jury retires to consider its verdict."  In other words, the defendant waives any objection to the jury instructions if not made before the jury retires.  The rule is intended to eliminate late challenges to jury instructions when a timely objection would give the trial judge the chance to consider objections and, if necessary, take corrective action before charging the jury.

Gregory did not object to the instructions before the jury retired to deliberate. Thus, Gregory's untimely objection to the jury instructions is waived, and we review only for plain error.[18]  Under plain error review, the error must be "apparent on the face of the record[,] . . . basic, serious and fundamental in their character, and ... clearly deprive an accused of a substantial right, or ... clearly show manifest injustice."[19]

The Superior Court essentially read to the jury the words of the statute defining the crime of official misconduct.  Although the court did not define the words "official functions" embedded in the statute, under 11 *Del.* C. § 221(c), the

---

[18] Gregory argues that he preserved his objection to the jury instructions by raising it in his post-trial motion for judgment of acquittal under Superior Court Criminal Rule 29.  But Rule 29 is aimed primarily at post-trial sufficiency of the evidence challenges, not the adequacy of jury instructions.  To allow post-trial objections to jury instructions under Rule 29 would render superfluous Rule 30's timing requirements and undermine the purpose of Rule 30 – to allow the trial judge to consider objections before charging the jury.

[19] *Buckham v. State*, 185 A.3d 1, 19 (Del. 2018) (alteration in original) (quoting *Wainwright v. State*, 504 A.2d 1096 (Del. 1986)).

jury could apply the "commonly accepted meaning" of the words.[20]   It was neither

a serious nor fundamental error to allow the jury to use common sense to define the

words "official functions."  The defendant recognized as much when he argued in a

motion to dismiss filed before trial that the State could argue to the jury that

Gregory's actions were official functions.[21]  Thus, the Superior Court did not clearly

err when it charged the jury by following the words of the statute.[22]

## III.

Gregory also argues that the Superior Court erred when it denied Gregory's

post-trial motion for judgment of acquittal.[23]  We must decide "whether any rational

trier of fact, viewing the evidence in light most favorable to the State, could find a

---

[20] Under § 221(c), "[i]f a word used in this Criminal Code is not defined herein, it has its commonly accepted meaning, and may be defined as appropriate to fulfill the purposes of the provision as declared in § 201 of this title."  Gregory points us to *Howell v. State*, 421 A.2d 892 (Del. 1980), where our Court addressed an appeal from convictions for official misconduct under § 1211(2). Our Court in *Howell* did not define official functions, except to say that subsection (2) was different from subsection (3) because subsection (2) "is not confined to the failure of a public servant to perform his official powers, functions or duties."  *Id*. at 897.  In our view, "official functions" is essentially synonymous with official powers, functions or duties, and therefore the failure to instruct the jury using essentially the same words would not rise to the level of plain error.

[21] App. to Opening Br. at A020 (the defense motion to dismiss argument).

[22] There are situations when the trial court should use available common law definitions to define statutory terms.  *See, e.g., Waters v. State*, 443 A.2d 500 (Del. 1982) (trial judge erred by failing to distinguish "reckless" as it relates to Murder in the Second Degree from "reckless" as it relates to Manslaughter; and to explain the meaning of the words "cruel, wicked and depraved indifference to human life.").  In *Waters*, the Delaware common law further defined statutory words important to distinguish between different crimes – not the situation here.  In any event, Gregory was content to leave the definition to the jury until he was convicted.

[23] Opening Br. at 26-27.

defendant guilty beyond a reasonable doubt of all the elements of the crime."[24] Gregory only challenges the sufficiency of the evidence for one element of the crime – whether Gregory was performing official functions when he earmarked the $40,000 grant for SDA.

Gregory argues on appeal that the Superior Court did not use the correct definition of official functions in its post-trial decision, and that, when the correct definition is used, the trial evidence was insufficient to support a conviction.[25] According to Gregory, an elected official performs official functions only when his "conduct [] relates specifically to the real and/or apparent authority of the public official's office."[26] He contends that a City Council President "does not have actual or apparent authority to submit an application for appropriations to the incoming City Council President per the Wilmington City Code or the Delaware State Code, since the President's 'official functions' with the budget is only to vote on its approval with the remaining members."[27] He also argues that "[he] lacked any actual or apparent authority to 'earmark' funds for the incoming President"[28] because "earmark" has no official meaning in the Wilmington City Charter. And for the

---

[24] *Clark v. State*, 224 A.3d 997, 1003 (Del. 2020) (quoting *Cline v. State*, 720 A.2d 891, 892 (Del. 1998)).

[25] Gregory also argues that the Superior Court improperly considered actions Gregory took after he left office. This argument fails because the court only considered actions that Gregory took when he was in office.

[26] Opening Br. at 14.

[27] *Id.* at 32.

[28] *Id.*

overlapping fiscal year in which they both served, he contends that only Shabazz had actual or apparent authority over the SDA appropriation.[29]

None of these arguments is convincing. For starters, Gregory admitted in the Wilmington Ethics Commission stipulation that, as an elected official, he utilized the influence of his office for personal pecuniary gain. Second, even using Gregory's definition of official functions, the trial evidence supported the jury's finding that Gregory was acting within his real or apparent authority as City Council President when he earmarked the grant money. As City Council President, Gregory had authority to approve grants involving taxpayer funds, and used that authority to direct a grant for his personal benefit. Gregory also directed his chief of staff – a government employee – to prepare the grant application while Gregory had exclusive control over the president fund. While Shabazz would later have control over the president fund, he had exclusive control over the fund when he earmarked the funds for his personal benefit. Finally, although the word "earmark" has no official meaning in the Wilmington City Charter, it is no stretch to say that the jury could have reasonably found that Gregory meant to set aside $40,000 of the $43,400 remaining in the president fund. Basnight testified at trial that she understood earmark to mean placeholder.

---

[29] *Id.* at 35.

In his post-trial opinion, the trial judge set forth a thorough summary of the evidence at trial supporting the jury' finding that Gregory was performing official functions when he earmarked $40,000 from the president grant fund:

> (1) the Council President had the sole authority to determine who received public money from the Fund; (2) Mr. Gregory served as Council President when he claimed in his email to his successor that the funds were already earmarked for SDA and when he made repeated overtures to Ms. Shabazz; (3) allocation of the total available $250,000 in funds for the 2017 fiscal year fell to Mr. Gregory's and Ms. Shabazz's discretion because their terms of office straddled the same fiscal year; (4) he admitted in the Wilmington Ethics Commission Agreed Disposition that he questioned Ms. Shabazz "on multiple occasions about the SDA grant proposal"; (5) he admitted in the Agreed Disposition that Ms. Shabazz "felt 'pressure' and a 'constant push' " from him to grant the request; and (6) he admitted that at his request, while he still served as Council President, his Chief of Staff submitted a draft grant application and list of steps that Ms. Shabazz would need to take to provide SDA the money, after she assumed the office.

Based on the above, the evidence at trial was more than sufficient for the jury to conclude beyond a reasonable doubt that Gregory was performing official functions when he earmarked the $40,000 grant for his non-profit and engaged in official misconduct under § 1211(3).

IV.

The judgment of the Superior Court is affirmed.