**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Betty FRANKENTHAL,**
**Defendant-Appellant.**

No. 77–1781.

United States Court of Appeals,
Seventh Circuit.

Argued March 3, 1978.

Decided August 15, 1978.

Franklyn M. Gimbel, Milwaukee, Wis., for defendant-appellant.

John A. Nelson, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before PELL and WOOD, Circuit Judges, and FLAUM, District Judge.*

PELL, Circuit Judge.

Defendant-appellant Betty Frankenthal was charged in the first count of a five-count indictment with conspiring to intercept, to endeavor to intercept, and to procure other persons to intercept wire communications and, by means of electronic devices, oral communications, in violation of 18 U.S.C. §§ 371, 2511(1)(a), 2511(1)(b)(iv)(A). Her co-conspirators were alleged to be her deceased father, Siegfried Frankenthal, and a private investigator hired by the Frankenthals, Jerome Leonard. The second, third, and fourth counts of the indictment charged her with endeavoring to use and procuring others to use electronic devices to intercept oral communications at three commercial establishments which were in competition with the Frankenthal family business. Count V charged appellant with intercepting, endeavoring to intercept, and procuring another person to intercept wire communications at one of the meat-packing plants in the family business. A jury convicted appellant on all counts, the district court sentenced her to two years of probation, and fined her $3,000 for each count, and this appeal followed.

* District Judge Joel M. Flaum of the Northern District of Illinois is sitting by designation.

Our disposition of the issues presented to us requires no extensive statement of the facts proved at trial. It suffices to state that the evidence tended to prove that Siegfried Frankenthal felt, in the fall of 1976, that certain of his competitors, with the possible aid of some of his employees, were conspiring to ruin his business by spreading rumors about his health. At his direction appellant communicated with Jerome Leonard, an investigator previously used by the Frankenthals, and arranged a meeting. The Frankenthals knew Leonard had been convicted of illegal wiretapping. At the first meeting, at which appellant was present, her father proposed electronic surveillance. Leonard replied that that was illegal, and the discussion proceeded into consideration of possible physical surveillance. After receiving a large retainer, Leonard approached a fellow investigator, one Layman, and proposed using electronic surveillance on the job. He returned to the Frankenthals and told them he would use wall taps to monitor conversations in the competitors' plants, at which point Mr. Frankenthal again proposed recording the conversations overheard. Layman subsequently approached the Federal Bureau of Investigation and told them what he knew, and it was agreed that Layman would continue to "cooperate" with Leonard. The F.B.I. subsequently arranged for the consented taping of staged conversations at the competitors' plants. These tapes were given to Leonard, and by him to the Frankenthals. In various telephone calls between appellant and Leonard, instructions on continuation of the monitoring were given. Appellant also worked with and instructed another person obtained by Leonard in eavesdropping on and recording various telephone calls made by Frankenthal employees from a Frankenthal plant.

■ Four arguments are made on appeal, three of which may be disposed of summarily. First, appellant says, quite accurately, that wilfulness was an element of all the charges against her, and she argues that there was insufficient evidence to prove it. However, if substantial evidence, taking the view most favorable to the

Government, supports a criminal conviction, an appellate court may not reverse it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We have reviewed the record, and are convinced that substantial evidence supports the jury's conclusion that appellant acted wilfully. Second, and relatedly, appellant suggests that the evidence raises a reasonable doubt that she may have been entrapped into committing the offenses. The jury was appropriately instructed, however, and its apparent rejection of the entrapment theory is adequately supported by the evidence.

■ Appellant's third claim of error arises from the district court's instruction at the close of the Government's case that statements and acts of alleged co-conspirator Leonard, which had earlier been preliminarily admitted, were then admissible, and that the jury could consider the statements and acts along with the other evidence in the case. Frankenthal argues that additional instructions were necessary to protect her right to a fair trial, namely that the Leonard evidence was only admissible as to the conspiracy count and that it could not be considered against appellant at all unless and until the jury found by independent evidence that she knowingly entered the conspiracy. The latter instruction was, in fact, given at the close of all the evidence. In *United States v. Papia*, 560 F.2d 827 (7th Cir. 1977), this court rejected identical objections to a virtually identical midtrial instruction. We adhere to the views announced therein.

Appellant's primary assertion of reversible error stems from cross-examination of a defense witness about an ex parte meeting he held with United States District Judge Myron Gordon, and from rebuttal testimony given, under subpoena, by Judge Gordon himself. The background facts were as follows: Attorney Bernard Berk was a longtime family friend of the Frankenthals and served Siegfried Frankenthal as his lawyer. He was called by the defense to testify that, in 1975, he had given an oral legal opinion to Mr. Frankenthal that to monitor

the telephone conversations of employees of the Frankenthal business would not be unlawful. If true, and if credited, this testimony might have established a defense at least to Count V of the indictment, because appellant testified that she was aware of the opinion and a good faith mistake as to the legality of monitoring employee conversations could have negated the wilfulness requisite to conviction on the count.

On cross-examination, the Government attempted to indicate that Berk's testimony was false. To make this point, Government counsel elicited admissions that Berk had never consulted with law enforcement officials on the subject of his legal opinion, and that he could not remember any of the authorities on which he relied in forming the opinion. The fact that Berk had been a close and long-time friend of the Frankenthal family had been brought out on direct examination, so there was no need to reestablish it on cross-examination. The Government also sought to demonstrate that Berk had a direct stake in the outcome of the litigation.[1] At Mr. Frankenthal's death, Berk had become the president and chief executive officer of the Frankenthal family business, and Government counsel asked whether it was not true that in that capacity Berk had "a great deal riding on the outcome of this proceeding." Berk denied this, and also denied ever having told anyone that the business had a great deal riding on the proceeding.

Government counsel then proceeded into the area of an ex parte meeting between Berk and District Judge Myron Gordon on May 26, 1977. Judge Gordon was then the judge assigned to preside over the trial of this cause, which had been set for June 20, 1977. The purpose of Berk's requested meeting with Judge Gordon was to urge the judge to postpone the trial date.[2] Berk explained that he was the president of the Frankenthal business, which had over 1800 employees, that delicate negotiations were underway for the sale of the business, and that the immediate trial of the instant case could jeopardize the negotiations, imperil the companies' financial health, and risk the jobs of all the employees. According to Berk's testimony, he went no further with Judge Gordon. Berk was quite adamant that he had never said, because it was not true, that he had any special concern for the *outcome* of the trial. His only concern was the *timing* of the trial. Berk was shown a letter written to counsel for the parties by Judge Gordon, which summarized his meeting with Berk and announced his recusal from the case, and which expressly stated that Berk had said a trial *and conviction* of Betty Frankenthal would jeopardize the companies of which Berk was president. Berk denied the accuracy of the reference to conviction. The letter was not read to the jury.

Thereafter, the Government called Judge Gordon to the stand. His testimony, which

---

1. We quickly dispose of two objections to the cross-examination about Berk's meeting with Judge Gordon, namely that the cross-examination went beyond the scope of the direct examination and that it raised irrelevant matter. Because, as will be seen hereinafter, the entire inquiry is pertinent to the existence of Berk's direct stake in the litigation, we address these frivolous objections at the outset. Rule 611(b), Fed.R.Evid., limits the scope of cross-examination to the subject matter of the direct examination "and matters affecting the credibility of the witness." As to relevance, it is true that relevant evidence is defined as that tending to make any fact of consequence to the litigation more or less probable, Rule 401, and that "except as otherwise provided" irrelevant evidence is inadmissible, Rule 402, but the credibility of a witness is always put in issue by his testimony. Hence, Rule 607 "otherwise provide[s]"

that "[t]he credibility of a witness may be attacked by any party . . . ." The relevance concept applies here only to assure that attempted impeachment at least tends to lessen the credibility of the witness.

2. It should be noted that the judge was not advised of the purpose of the meeting in advance, and, when the conversation entered the area of one of his assigned cases, he cautioned Berk about the potential impropriety of any further discussion. Berk reassured Judge Gordon that he was an attorney and that the judge could rely on his good judgment not to cross the line of impropriety, at which point the conversation proceeded as described. We make no intimation whatsoever that Judge Gordon committed any impropriety in hearing Berk out in these circumstances.

is transcribed as a mere five pages, was a short summary of the Berk meeting, including Berk's statement that "if there should be a conviction," the companies and the employees would suffer financially. On cross-examination, Judge Gordon testified that neither Betty Frankenthal nor her defense counsel had ever engaged in any improper contacts with him. Berk had earlier testified that his visit to the judge was personally inspired, and without the knowledge or approval of appellant or her counsel.

The facts just discussed establish beyond peradventure that evidence of Berk's meeting with Judge Gordon could tend to establish that Berk had bias and an interest in the outcome of the litigation. According to Judge Gordon's version of the meeting, Berk admitted as much to him. To say this much is to come a long way towards affirming appellant's conviction. For "[t]he partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Because of the importance of evidence of bias or interest, inquiry into the area is never collateral, and a witness' denial of the facts constituting bias or interest may be rebutted with extrinsic evidence. *United States v. Robinson*, 174 U.S.App. D.C. 224, 227, 530 F.2d 1076, 1079 (1976); *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir. 1972), *cert. denied*, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110; 3 Weinstein's Evidence ¶ 607[03] at 607–17 (1977); McCormick's Handbook of the Law of Evidence § 40 at 81 (2d ed. 1972).

This is not to say, however, that the trial judge does not retain his normal discretion to limit the extent of the proof, even where bias or interest is involved. *District of Columbia v. Clawans*, 300 U.S. 617, 632, 57 S.Ct. 660, 81 L.Ed. 843 (1937); *Blackwood, supra; Blair v. United States*, 130 U.S.App.D.C. 322, 325, 401 F.2d 387, 390 (1968); *Wynn v. United States*, 130 U.S. App.D.C. 60, 63, 397 F.2d 621, 624 (1967); 3 Weinstein's Evidence, *supra* at 607–17— 607–18. A classic example would be where purely cumulative proof was offered. But this "judicial discretion soundly exercised contemplates that there will be ample latitude for pertinent inquiry." *Wynn, supra* at 63, 397 F.2d at 624 (footnote omitted). Counsel attempting to show bias or interest must be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska, supra*, 415 U.S. at 318, 94 S.Ct. at 1111.

Appellant cannot contend here that the attempted impeachment was cumulative. It is true that Berk had admitted being a family friend of the Frankenthals, a fact for the jury to consider in weighing his testimony, but a jury's experience with probable human behavior would not, we trust, necessarily lead it to conclude that an officer of the court would lie under oath merely in the interests of friendship. Moreover, Berk's interest in the litigation would not be cumulative of a possible friendship bias, as, by definition, the former element establishes a more direct motivation to testify falsely. Also, as we have noted, Berk flatly and repeatedly denied having told Judge Gordon he had any concern over the *outcome* of the trial. Because the trial proceeded exactly as Judge Gordon had originally scheduled it, Berk's testimony that his only concern had been the *timing* of the trial could have led the jury to conclude that, once the timing issue had been settled despite Berk's protests, he retained no motive to testify falsely.[3] This would

---

3. Appellant argues that, at most, Berk's indication of concern over a conviction was also a timing concern, so the evidence from Judge Gordon did not really and materially conflict with Berk's testimony. This is unpersuasive. Even if Berk's concern about the possibility of conviction would have evaporated had the trial been postponed until after the Frankenthal business could be sold, the fact is that the trial was not postponed, the negotiations for the sale of the business were pending even as Berk testified, and any concern over the timing of

have left the false impression that the Government was engaged in a speculative and baseless attack on his credibility. *See Davis v. Alaska, supra* at 318, 94 S.Ct. 1105.

■ Appellant's argument really comes down to the assertion that the probative value of this bias evidence was grossly outweighed by unfair prejudice. This is, of course, a proper ground of attack. Fed.R. Evid. 403; *United States v. Maynard,* 155 U.S.App.D.C. 223, 476 F.2d 1170 (1973). But in assessing the potential prejudice and how it should have been weighed in the broad discretion of the district court, *see United States v. Krohn,* 560 F.2d 293, 296 (7th Cir. 1977), *cert. denied,* 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182 (1977), we cannot but note the clear tendency of the evidence to demonstrate bias and the importance of giving the jury a fair opportunity to judge credibility. We also note that it was appellant who called Berk to the stand, knowing of his meeting with Judge Gordon and of Judge Gordon's statement that Berk had admitted concern over the possibility of conviction. Defense counsel did not hesitate in rejecting the district court's proposal that inquiry into the Berk-Gordon meeting could be ended and the jury instructed to disregard it if counsel agreed to have Berk's testimony stricken. Frankenthal has thus taken the position that she should have been given the benefit of Berk's testimony without having his credibility attacked on the basis of facts well known to her before she called Berk to testify. This consideration is not irrelevant in deciding whether any prejudice created was "unfair" within the meaning of Rule 403.

Frankenthal posits two different theories of unfair prejudice. First, she says that the jury could hardly have avoided the inference that Berk, her father's long-time friend and counsel, must have approached Judge Gordon with the approval, encour-agement or at least acquiescence of appellant and/or her defense counsel. Defense counsel took the position at oral argument here that the whole Government theory in the case was that "money can buy anything," and as applied to this situation the implication would be "even a federal judge." Had there been some such misuse of Judge Gordon's testimony, we would have no hesitancy in reversing appellant's conviction, precisely for the reason we now reject this ground of asserted prejudice. There was simply no testimony at all that Frankenthal or her counsel had anything to do with the ex parte meeting. Judge Gordon expressly stated that neither person had ever acted improperly to his knowledge. Berk made clear that he had not informed anyone of his intentions prior to meeting Judge Gordon. Moreover, the district court specifically instructed the jury at the close of the evidence that the ex parte meeting "had nothing to do with [appellant] under the record in this case." We see no reason to assume that the jury ignored the evidence and the instruction in the manner suggested.[4]

The second unfair prejudice theory advanced is that injecting a federal judge into a criminal trial on the Government's side necessarily invokes the prestige and authority of his office in support of conviction. We agree at least to the extent that calling a judge to give testimony in any proceeding is a very delicate matter. Fed.R.Evid. 605 flatly prohibits testimony from the judge who is presiding at trial, on the grounds that giving evidence for either side would be inconsistent with the impartiality expected and required of the presiding officer and that difficult practical questions would inevitably arise as to who is presiding over the trial while the judge is on the stand. Somewhat more to the point is Canon 2 of

the conviction would thus have provided a real and present motive to give false testimony in that a verdict of acquittal could have obviated the deleterious effect of the criminal charges.

**4.** We also think it likely that defense counsel could have obtained a stipulation that appellant had nothing to do with the meeting if he had attempted to do so. The Government counsel, had, after all, responded to this asserted ground of prejudice by telling the district court that there was absolutely no evidence connecting appellant with the meeting and that the Government surely did not intend to offer any.

the Code of Judicial Conduct, which provides in part that "[a] judge . . . should not lend the prestige of his office to advance the private interests of others. . . . He should not testify voluntarily as a character witness." The accompanying commentary makes the point that

> the testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies and may be misunderstood to be an official testimonial.

This case, obviously presents a significantly different question, for Judge Gordon did not testify as to anyone's character or reputation. His testimony was limited to a recitation of facts relevant to the jury's task of which he, and, aside from Berk, only he had knowledge. Nonetheless, the possibility that prestige, dignity, and authority may have somehow been imparted to the prosecution's case by the judge's appearance on its behalf cannot lightly be dismissed.

We have concluded that Judge Gordon's testimony, although creating sensitive problems requiring delicate attention, was handled in a manner appropriate thereto and adequate to minimize any risks of unfair prejudice. The judge gave only brief and strictly factual testimony, of which no misuse was made by Government counsel. The district court instructed the jury that the judge's testimony could only be considered in assessing Berk's credibility and that in no way constituted evidence against the accused. The court offered to give this instruction (and another, that a judge's credibility should be weighed the same as that of any other witness) midtrial, although defense counsel declined the offer, being of the view that incurable prejudice had been engendered. Perhaps most importantly, Judge Gordon possessed factual knowledge that was highly pertinent to the jury's task, and he was the only possible source of testimony on that knowledge. To say that the district court abused its discretion by admitting the testimony in these circumstances would be tantamount to announcing a rule that a judge may never testify in criminal proceedings, no matter how important his testimony or how well the delicacy of his

being called is handled. The interests of justice would be served poorly indeed by such a rule, and we decline its adoption as the law of this circuit. So far as we are aware, no court has even come close to adopting such a position.

For the reasons stated herein, the judgment of conviction from which appeal is taken is

AFFIRMED.