Paul E. WEBER, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 23, 1982.

Decided: Jan. 17, 1983.

L. Vincent Ramunno, Wilmington, for defendant below, appellant.

Gary A. Myers, Deputy Atty. Gen., Georgetown, and Charles M. Oberly, III, Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C.J., HORSEY and MOORE, JJ.

MOORE, Justice:

Paul E. Weber killed 17 year old Dirk T. Henson and was then convicted by a jury of second degree murder[1] and possession of a deadly weapon during the commission of a

---

1. 11 *Del.C.* § 635(1) provides that "A person is guilty of murder in the second degree when: (1) He recklessly causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life."

felony.[2] Weber appeals these convictions on several grounds, but we address only three:

1) the refusal of the trial court to permit the jury to hear that the State's eye-witnesses to the alleged crime had received cash payments from the victim's family before testifying;

2) the police failure to inform Weber during custodial interrogation that both his father and a privately retained lawyer were present at the police station and wanted to see him, aggravated by the investigator's later deceptive representation to them that Weber had been advised of his rights, declined the lawyer's services and made a statement; and

3) the lack of jury instructions defining the elements of second degree murder.

These are fundamental errors mandating reversal and a re-trial, but we do not arrive at that conclusion lightly. After oral argument we granted the State's motion for supplemental argument so that its trial counsel in this case could appear and reargue certain limited issues which the State believed it had not properly addressed at the first argument. Thus, we have considered the State's position in detail and our reversal is limited to the above-stated grounds.[3]

## I.

On January 8, 1981, Weber, then 18 years old, stabbed Dirk T. Henson in an apartment building in Newark, Delaware. The knife penetrated Henson's heart, and he died en route to the hospital. This, however, was not a random killing, but the tragic conclusion of a long-standing feud, punctuated by several prior confrontations of a very threatening nature, between the two youths.

The evidence is totally conflicting and replete with charges, countercharges and wholesale denials between the stories told by the prosecution and defense witnesses as to threats Weber and Henson had made to each other, and the acts of physical aggression between the two which finally led to the confrontation that ended in Henson's death.

On January 8, 1981, the day he died, Henson called Weber between 5:00 p.m. and 5:30 p.m., accusing Weber of making derogatory remarks to and attempting to run over Henson's girlfriend. Henson invited Weber to meet him in a park in his neighborhood. Weber called two of his friends to relate the conversation and then went to the park to see if anyone was there. About

2. Possession of a deadly weapon during the commission of a felony is proscribed by 11 Del.C. § 1447:

> (a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony. Possession of a deadly weapon during commission of a felony is a class B felony.
>
> (b) Notwithstanding § 4205 of this title, the minimum sentence for a violation of this section shall be not less than 5 years which minimum sentence shall not be subject to suspension and no person convicted for a violation of this section shall be eligible for parole or probation during such 5 years.
>
> (c) Any sentence imposed upon conviction for possession of a deadly weapon during the commission of a felony shall not run concurrently with any other sentence. In any instance where a person is convicted of a felony, together with a conviction for the possession of a deadly weapon during the commission of such felony, such person shall serve the sentence for the felony itself before be-

ginning the sentence imposed for possession of a deadly weapon during such felony.

> (d) Every person charged under this section over the age of 16 years shall be tried as an adult, notwithstanding any contrary provision of statutes governing the Family Court or any other state law.
>
> (e) A person may be found guilty of violating this section notwithstanding that the felony for which he is convicted and during which he possessed the deadly weapon is a lesser included felony of the one originally charged.

3. We have considered the defendant's arguments that he was impermissibly indicted for second degree murder by the grand jury after he had been "bound over" for manslaughter at a preliminary hearing before the Court of Common Pleas. In our opinion that position is without merit. While we do not address Weber's other claims, that does not signify any view that such issues lack merit.

thirty minutes after Henson had called, Weber phoned the New Castle County police. When an officer responded to the call, Weber related Henson's phone call. Though expressing his fear of being confronted by Henson and his companions, Weber told the officer that he "wasn't afraid of [Henson] if he was alone" and if "he got in a conflict with him, he could take him, wouldn't be any problem with that". The officer went to the park to investigate, advising Weber to call again if there were further problems.

In the meantime, Henson, who had been drinking, and several of his friends had gone to the park to see if Weber had arrived. Not seeing Weber, Henson and three friends then drove to Weber's house. Encountering Weber and a friend of his, they shouted threats and obscenities at Weber from their car but soon left. The evidence was conflicting whether any weapons were displayed and whether anyone left the car.

Weber returned to the house and called the police. After the police left, Weber went to the apartment of his girlfriend, Sonya Felmy, to keep a previously arranged date. Henson, who knew Felmy, coincidentally decided to see her to ask her to mediate between Weber and him. Henson was accompanied by James Brian Kane, Terry Owens, and Ronald Richard, two of whom had been with him earlier at Weber's house. Upon their arrival, Henson spotted Weber's car and surmised that Weber was in Miss Felmy's apartment.

According to the State's witnesses, Henson went into the building, while his friends waited outside, knocked on Miss Felmy's door, and asked to speak to Weber. When Weber appeared, an argument started over Weber's previous conduct toward Henson's girlfriend. In the meantime, Henson's companions had entered the building and formed a semi-circle behind him. Although the argument was loud, two other residents in the building, attracted at first by the noise, testified that neither Henson nor his friends physically threatened Weber or exhibited any weapon. At Weber's request, Henson's friends left. The arguing subsided, and Henson asked Weber to come outside to settle the matter, but Weber pulled a knife. Henson, his arms outstretched, calmly told Weber to put the knife away since he was unarmed. As Henson approached, Weber stabbed him once.

Weber gave a different account of this fatal meeting. After Henson's friends had entered the building, they became loud and abusive and jostled him several times. The four youths had moved him away from the apartment door, and they were less than an arm's length from him. They also reportedly threatened to take him behind the apartment building and beat him. When their attention was diverted by the appearance of Miss Felmy's mother, Weber produced his own knife. When the mother went back into the apartment, Henson's friends left the hallway. Henson started to pull Weber from the wall and downstairs to the rear of the building. Weber broke away and Henson approached him again, appearing to reach for brass knuckles in his pocket. In the meantime, Henson's friends had re-entered the hallway, carrying some type of weapon. Weber, claiming self-defense, then stabbed Henson once in the chest.

Weber was subsequently indicted for second degree murder and possession of a deadly weapon during the commission of a felony. His main defense was that the use of deadly force was justified.[4] The jury

4. Justification, as defined in 11 *Del.C.* §§ 462–70, is a defense in any prosecution. 11 *Del.C.* § 461. Weber relied on 11 *Del.C.* § 464, regulating the use of force in self-defense:

(a) The use of force upon or toward another person is justifiable when the defendant believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(b) Except as otherwise provided in subsections (d) and (e) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering pos-

rejected that claim and found Weber guilty as charged. With the circumstances of Henson's death before us, we turn to the issues mandating reversal.

## II.

### A.

A most serious matter arose on the third day of trial. Weber's counsel informed the court that it appeared the Henson family had paid money to several State witnesses. The record does not suggest that the prosecutors knew of this until the defense raised the subject. When one of the prosecutors asked the victim's parents if they had given money to any witness, the Hensons denied having done so. The prosecutor then reported these representations to the court and defense counsel. That night Mrs. Henson telephoned one of the prosecutors and revealed her involvement, thus confirming the defense allegation of her payments to witnesses.

At defense request, a hearing into the alleged payments was held the next day outside the presence of the jury. James Kane, a 19 year old friend of Henson, testified that during the week before trial Henson's grandmother, Jocelyn P. Jamison, had provided eighty-five dollars for a new suit and a haircut. The cash was actually delivered by Henson's girlfriend, Kandice Ow-ens, who had received it from Henson's mother. Kane stated that immediately prior to receiving the cash, he had told Mrs. Henson what his testimony would be in general terms. Kane and Owens denied that Mrs. Henson coached Kane, but Mrs. Henson did voice her approval of Kane's statements. Kandice Owens testified that she had delivered similar sums of cash to her 17 year old brother, Terry, and to Ronald Richard, aged 19, who were also State witnesses.

Mrs. Henson confirmed these accounts. Defense counsel then queried her motives for the payments. According to Mrs. Henson, Mrs. Jamison had learned that Weber was buying new clothes for his trial. Mrs. Jamison believed that she should do something similar for her grandson's friends and asked Mrs. Henson to arrange it. Pressed by defense counsel, Mrs. Henson admitted that she and Mrs. Jamison wanted to make the witnesses appearing against Weber look better to the jury.[5]

Weber's counsel urged that the jury hear this evidence primarily because it was essential to the jury's assessment of the witnesses' character and credibility. The trial judge refused on the ground that there was no difference between the witnesses' testimony and their prior statements to the police. Accordingly, there was no evidence

---

session, doing any other act which he has no legal duty to do or abstaining from any lawful action.

(c) The use of deadly force is justifiable under this section if the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping or sexual intercourse compelled by force or threat.

\*     \*     \*     \*     \*     \*

**5.** This desire of the Henson family was twice confirmed by Kane's testimony at the hearing. In light of the appearance of these youths, including Henson's on the night he died, it is no wonder that the Henson family worried about the impression they would make on the jury. One witness testified:

Mr. Paul: Q. When you got out in the hallway, what did you see?

Kirkland: A. Four roughneck-hippie-type kids, teenagers.

\*     \*     \*     \*     \*     \*

Q. Okay. When you say hippie-teenager-type children or boys, can you be a little more specific than that?

A. Well, I mean big guys, rough looking, long hair, a band around his head, beards, and just the hood-type—

Q. Hoodlike?

A. —jackets.

Q. You mean hoodlum?

A. Hoodlum types.

Another witness described Henson as being five or six inches taller than Weber and "much broader". One of the other boys "had a bandana around—twisted and then across his forehead like a sweatband" and wore a denim "or dark" jacket, but the witness was unsure whether it was a black leather jacket.

that the cash payments influenced their testimony.[6]

We believe that this was too narrow a focus by the trial court, particularly since the physical appearance of these witnesses was an issue in the case. The State's rebuttal argument to the jury highlights the error of this ruling. To persuade the jury that the witnesses were not members of a gang, but clean-cut teenagers, the prosecutor made this comment about their courtroom appearance:

> He (defense counsel] described the individuals in the hallway, Terry Owens, Ronald Richard, Brian Kane, and he describes them in various parts during the trial; describes them as a mob, a gang, the debris, a gang of thugs, the gutter sweepings of Newark.
>
> You saw them testify. *You saw each and every one of them on the stand. Are they the gutter sweepings of Newark?* I submit not. (Emphasis added.)

### B.

Weber contends that he was denied his constitutional right to impeach the credibility of the three witnesses, relying on *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) and *Wintjen v. State,* Del.Supr., 398 A.2d 780 (1979). He further argues that the error was compounded by the State's reference, during its rebuttal argument, to the witnesses' appearance at trial while the defense was prohibited from showing the real facts. The State responds that the confrontation clause of the sixth amendment only gives a defendant the right to discredit a witness by showing bias or self-interest. The State also says that because there was no indication the payments altered the witnesses' testimony, the evidence had no probative value. To have pursued the issue would have prolonged the trial needlessly. The State also suggests that during the cross-examination of each witness, Weber could have questioned them about the differences in their appearance but failed to do so.

In light of the testimony given by James Kane and Mrs. Henson, that she reviewed the youths' testimony with them before the cash was paid, we approach the matter with deep concern for the proper administration of justice in Delaware. No great leap in logic is needed to infer that after this session with Mrs. Henson, followed by the payment of money, Kane's bias against Weber was enhanced to a degree greater than that created by his friendship with Henson.

Clearly the question of bias was before the court, and the defense had an absolute

---

**6.** The trial judge expressly disapproved of the payments made to the witnesses. Needless to say, we also condemn the conduct of Mrs. Henson and Mrs. Jamison in this case, which was materially exacerbated by Mrs. Henson's initial lack of candor with the prosecutor. Their actions, if not falling within the ambit of the criminal proscriptions against bribing a witness (11 *Del.C.* § 1261), certainly violate the spirit of the law and cast into doubt the integrity of the proceedings in this case. *Cf. State v. Ventola,* Conn.Supr.Ct. Errors, 122 Conn. 635, 191 A. 726 (1937) (intent to induce false testimony is not required; it is sufficient if a benefit is given or offered with an intent to influence testimony). Similar conduct by an attorney would violate the Code of Professional Responsibility. *See* DR 7–102(A)(4)–(7); EC 7–28. *See also* DR 7–109(C).

Though there is no evidence that the prosecutors were aware of or participated in the payments to the three witnesses, it is now axiomatic that a conviction may be invalid under the fourteenth amendment if a prosecutor has knowingly elicited false testimony relating to a witness' credibility or if the prosecutor has knowingly allowed the witness to testify falsely. *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957). In addition, a conviction may be invalid if a prosecutor has bribed prosecution witnesses. *White v. Ragen,* 324 U.S. 760, 763–64, 65 S.Ct. 978, 980–81, 89 L.Ed. 1348 (1945). These tactics, as well as less blatant attempts to improperly influence a witness' testimony, are fundamentally unfair and pervert the truth-seeking function of trial. Such conduct has no place in the criminal justice system of this State, and we would be hard put not to reverse any conviction obtained through these methods.

right to pursue it.[7] This conclusion follows an examination of the issue on two levels—evidentiary, relating to the trial judge's discretion, and constitutional.

We start with the evidentiary principle stated in Delaware Rule of Evidence 607: "The credibility of a witness may be attacked by any party, including the party calling him." While this establishes the right under the Delaware Rules of Evidence to impeach a witness, it does not describe the permissible means for doing so. Rule 608(b) speaks directly to that point:

> (b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
>
> The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

The question then is whether the evidence of the youths' possible bias was excludable under Rule 608(b). We conclude it was not.

## C.

It is well settled that the bias of a witness is subject to exploration at trial and is " 'always relevant as discrediting the witness and affecting the weight of his testimony' ". *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) [quoting 3A J. Wigmore, Evidence § 940, at 775 (Chadbourn rev. ed. 1970) ]. *See, e.g., Saladino v. Winkler,* 609 F.2d 1211 (7th Cir.1979); *United States v. Cravero,* 545 F.2d 406 (5th Cir.1976); *Wintjen v. State,* Del.Supr., 398 A.2d 780 (1979); *State v. Crudup,* N.J.Super.Ct.App.Div., 176 N.J.Super. 215, 422 A.2d 790 (1980). The logical extension of this principle requires that counsel be permitted to inquire into any acts, relationships, or motives reasonably likely to create bias. *Cravero,* 545 F.2d at 419. *See Chipman v. Mercer,* 628 F.2d 528 (9th Cir.1980); *Crudup,* 422 A.2d at 793.

Rule 608(b) did not change this fundamental concept. As the United States Court of Appeals for the Second Circuit has observed with respect to Federal Rule of Evidence 608(b),[8] the rule "was intended to regulate only the use of specific instances of conduct to prove that the witness is a 'bad person' or is a generally untruthful person who should not be believed". *United States v. James,* 609 F.2d 36, 46 (2d Cir.1979). *See Carter v. Hewitt,* 617 F.2d 961, 969 (3d Cir.1980). Thus, the limitation created by Rule 608(b) is designed to avoid "mini-trials" into the "bad acts" of a witness which would require the use of extrinsic evidence to prove such acts. *Carter,* 617 F.2d at 971. But a witness' bias is never a collateral issue as contemplated by Rule 608(b), and extrinsic evidence is admissible to establish that the witness has a motive to testify falsely. *Saladino,* 609 F.2d at 1214; *James,* 609 F.2d at 46; *United States v. Frankenthal,* 582 F.2d 1102, 1106 (7th Cir.1978); *United States v. Harvey,* 547 F.2d 720, 722 (2d Cir.1976); McCormick, Evidence § 40, at 81 (2d ed. 1972).

**7.** We emphasize that counsel must explain the basis for admission or exclusion of evidence in order to preserve the issue for appeal. Del.R. Evid. 103(a); Supr.Ct.R. 8. Perfect citation to the evidence rules is not necessary, Del.R.Evid. 103(a)(2), but when admission of impeachment evidence depends on the theory being advanced at trial, counsel must clearly state why the evidence should be admitted or excluded. *See* S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 127 (3d ed.1982). *See also Cheek v. Bates,* 615 F.2d 559, 561–63 (1st Cir. 1980).

**8.** Federal Rule of Evidence 608(b) and Delaware Rule of Evidence 608(b) are identical.

Here, the evidence of bias was obtained from the very witnesses whose credibility was under attack. Rule 608(b) is not concerned with that situation, *Carter,* 617 F.2d at 969–70, and the extrinsic evidence rule is hardly violated when witnesses admit to receiving payments from the victim's family made in contemplation of their testimony at trial. Certainly, the defense was entitled to ask the prosecution witnesses about the cash payments from Mrs. Henson and Mrs. Jamison. If they had denied accepting the money, the defense could then prove by extrinsic evidence that they had been paid, but that was totally unnecessary here.

■ The trial judge, of course, retains his normal discretion to limit the extent of such proof. *Frankenthal,* 582 F.2d at 1106; Del. R.Evid. 403, 611(a). *See United States v. Leake,* 642 F.2d 715, 718 (4th Cir.1981). In exercising his discretion, the trial judge should consider (1) whether the testimony of the witness being impeached is crucial; (2) the logical relevance of the specific impeachment evidence to the question of bias; (3) the danger of unfair prejudice, confusion of issues, and undue delay; and (4) whether the evidence of bias is cumulative.[9] However, the trial judge's discretion is not absolute, and he can not foreclose a legitimate inquiry into a witness' credibility. *See Davis v. Alaska,* 415 U.S. at 318, 94 S.Ct. at 1111; *Frankenthal,* 582 F.2d at 1106; *Crudup,* 422 A.2d at 793. That is

particularly so, where, as here, the payments were made in contemplation of the witnesses' testimony, which was in such sharp dispute with that of the defense on the critical issue of guilt. Thus it strains reason to perceive how cash payments made by the victim's family to a group of witnesses adverse to the defense would not be a very proper subject of cross-examination at any time.

It seems there was too much emphasis placed on the danger of confusion and delay in the trial court, rather than considering all of the above factors before evidence of the cash payments was excluded. The conduct of James Kane and Mrs. Henson, which the defense sought to expose to the jury, was probative of Kane's bias since he testified that he had accepted the cash before trial, and only after he had discussed his testimony with Mrs. Henson, apparently on her initiative. Clearly, this was evidence of a bias wholly independent of that which one would normally expect Kane to harbor against Weber.

Moreover, Kane's testimony for the State was important since he was an eyewitness to and participant in most of the events immediately preceding Henson's death. Indeed, his testimony is in pointed contrast to that of the defense. Our observations about Kane's testimony and the appearance of bias created by the cash payments are equally applicable to Owens and Richard,

**9.** The State contends, relying on *United States v. Osborne,* 447 F.Supp. 862 (E.D.Pa.), *aff'd,* 588 F.2d 824 (3d Cir.1978) (table), that in light of the similarity of the statements the three youths had given in January and their trial testimony, presenting the evidence here of the cash payments was not necessary. After the trial in *Osborne,* the defendant moved to dismiss the indictment or to reopen the trial for additional evidence, alleging that the Government had failed to disclose a promise of preferential treatment made to a key government witness. Prior to the agreement, the witness had testified to substantially the same matters as he did at trial, and two other witnesses corroborated his testimony. Because of the substantial identity of the pre-agreement and post-agreement testimony, the court held that disclosure of the agreement would not have affected the witness' credibility.

In this case, the new evidence of bias came to light in the middle of the State's case-in-chief, not after the trial had ended as in *Osborne.* In addition, the defendant in *Osborne* sought more serious sanctions against the Government, i.e., dismissal or new trial, while in this case, the defense only requested a chance to present the evidence to the jury. Finally, the court in *Osborne* judged the defendant's request according to *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), asking if, in the context of the entire record, the additional evidence would create a reasonable doubt not otherwise present. Since there was no prosecutorial involvement here, *Giglio* and *Agurs* are inapplicable. We therefore conclude that the State's reliance on *Osborne* is misplaced in this instance.

the other witnesses who received cash from the Henson family. The jury might have discounted the bias created by the youths' friendship for Henson, but the effect of cash payments to *three* crucial prosecution witnesses might not have been so easily disregarded by the jury during this emotionally charged trial.

■ In reaching our decision to reverse Weber's convictions on this ground we also are buttressed by an analysis of the question whether the jury had sufficient information "to make a discriminating appraisal of the [witnesses'] possible motives" for testifying as they did. *James*, 609 F.2d at 47. *See Wintjen*, 398 A.2d at 782. Evidence of these payments was not cumulative with respect to the youths' bias. Earlier cross-examination of them only revealed bias against Weber because of their friendship with Henson, and in the case of Owens, because of Weber's alleged conduct toward Henson's girlfriend, who is Owens' sister. Clearly, Weber was not given a full opportunity to present relevant and wholly independent evidence of bias on the part of these witnesses, and that, we conclude, was reversible error.

### D.

■ More than evidentiary rules are involved here, which leads us to the fundamental issues of constitutional law presented by these disgraceful payments. Both the United States and Delaware Constitutions guarantee the right of a defendant to confront the witnesses against him. U.S. Const. amend. VI; Del. Const. art. I, § 7.[10] A certain threshold level of cross-examination is constitutionally required, and the discretion of the trial judge may not be interposed to defeat it. *E.g., Greene v. Wainwright*, 634 F.2d 272 (5th Cir.1981); *Chipman v. Mercer*, 628 F.2d 528 (9th Cir. 1980); *United States v. Summers*, 598 F.2d

450 (5th Cir.1979). *See Cheek v. Bates*, 615 F.2d 559 (1st Cir.1980). When the cross-examination relates to impeachment evidence, the test for determining if the trial judge's limitation on cross-examination violated the defendant's confrontation right is whether the jury had in its possession sufficient information to appraise the biases and motivations of the witness. *Chipman*, 628 F.2d at 530. More specifically, we look to the cross-examination permitted to ascertain (1) if the jury was exposed to facts sufficient for it to draw inferences as to the reliability of the witness and (2) if defense counsel had an adequate record from which to argue why the witness might have been biased. *Summers*, 598 F.2d at 461.

Of course some topics will be of marginal relevance, and the trial court in such situations may properly prohibit cross-examination or allow only limited questioning. Under *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the trial court is not required to allow cross-examination on topics of marginal or minimal relevance merely because bias or prejudice might be disclosed. *Chipman*, 628 F.2d at 531; *Skinner v. Cardwell*, 564 F.2d 1381, 1388–89 (9th Cir.1977). Consistent with the defendant's confrontation rights, the trial court may weigh the offer of proof to determine its probative value to the trier of fact and its effect on the orderly conduct of trial. *Chipman*, 628 F.2d at 531. *See Skinner*, 564 F.2d at 1388–89. But in the first instance, the United States and Delaware confrontation clauses create a presumption in favor of cross-examination, *Greene*, 634 F.2d at 275; *Chipman*, 628 F.2d at 531, especially in matters relevant to credibility.

■ Here, the trial judge clearly intended to expedite the case and to avoid introduction of what the State called "collateral" issues that might distract or confuse the

---

**10.** The U.S. and Delaware Constitutions provide in pertinent part:

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI.

and

"In all criminal prosecutions, the accused hath a right ... to meet the witnesses in their examination face to face...." Del. Const. art. I, § 7.

jury. *Compare Chipman,* 628 F.2d at 529–30. Yet, consistent with our holding on evidentiary grounds, the relevance of the proposed line of questioning on the issue of bias was such that the judge's ruling violated Weber's right to confront the witnesses against him. This evidence was not cumulative as to their credibility, and the jury could draw what inferences it wished from the fact that such payments were made. This is so, even if the jury was unlikely to conclude that the payments enhanced the witnesses' bias or would have any effect on their testimony. *Davis,* 415 U.S. at 317, 94 S.Ct. at 1111; *State v. Crudup,* N.J.Super.Ct.App.Div., 176 N.J.Super. 215, 422 A.2d 790, 793 (1980).

Moreover, we doubt that evidence of payments made to a witness in contemplation of his testimony is ever properly excluded. In focusing on the consistency between the witnesses' pre-trial statements and their trial testimony, the judge was actually making a determination of credibility which should have been left to the jury. By ruling out evidence of the payments on the ground that there were no inconsistencies in the witnesses' pre-trial and trial statements, the court was equating consistency to truthfulness. While that is generally an indicia of honesty in most circumstances, here there were intervening payments which the jury could have concluded prevented an honest recantation and assured an untruthful consistency. When cross-examination regarding the cash payments was prohibited, the jury was denied additional relevant information with which it could assess the witnesses' credibility. That decision was constitutionally impermissible. *Davis,* 415 U.S. at 317, 94 S.Ct. at 1111; U.S. Const. amend. VI; Del. Const. art. I, § 7.

This is particularly so since the prosecutor's reference to the clean-cut appearance of these witnesses at trial could only have been made by taking advantage of the one important point the defense was not permitted to raise before the jury—that their improved appearance was due to the cash paid them by Henson's family. The prosecutor's comments suggested to the jury that the youths' physical appearance at trial was the way they normally looked. Because of the court's ruling, the defense could not put that issue into perspective before the jury, while the prosecution openly capitalized on all aspects of this patently one-sided situation. Under the confrontation clauses of both the United States and Delaware Constitutions, *supra,* this was a clear denial of a fundamental constitutional right.

### E.

While the State argues that all this is harmless error under *Wintjen v. State,* Del. Supr., 398 A.2d 780 (1979) [*see Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)], the standards used to determine if there is a violation of the confrontation clause in the first instance are similar, if not identical, to those used in deciding if the error was harmless. *Compare Summers,* 598 F.2d at 461 *with Wintjen,* 398 A.2d at 782. *See also Chipman,* 628 F.2d at 533. With those factors in mind it follows that for the same reasons we found the trial court's ruling to be incorrect under the confrontation clause, the limitation on cross-examination here could not have been harmless beyond a reasonable doubt.

The State also suggests that Weber waived his rights by failing to cross-examine the three witnesses about the changes in their appearance. We note, without deciding, that absent the cash payments such questioning might have been subject to objection on grounds of relevance, since there was no issue of identification of the witnesses at the scene of Henson's death. It was not until the cash payments were disclosed that the youths' physical appearance, which was related to the issue of their bias, clearly became relevant. When the court excluded evidence of the payments, counsel certainly could not be expected to recall the three youths to inquire about matters, the heart of which had been prohibited by the trial judge. *See Wintjen,* 398 A.2d at 782–83. No waiver resulted under these circumstances.

### III.

We next turn to the matter of Weber's statement to the police. Following Henson's death, Weber was arrested immediately and taken into custody by the New Castle County police. Weber's father contacted a lawyer who had previously represented Weber and asked him to go to the police station to talk to Weber. Counsel arrived at the station at about 9:15 p.m., and he and Weber's father then asked to see Weber. They were told that they would have to wait until the chief investigating officer arrived and consented to their visit. The two men waited, and at about 11:35 p.m., a detective told the lawyer that he would not be permitted to speak with Weber unless Weber asked to see an attorney. Counsel said he wanted to be present if a statement was taken and asked the detective to tell Weber that he was at the station if Weber wished to see him. However, the police never communicated this to Weber. At about 1:00 a.m. on January 9th, two detectives told the lawyer and Weber's father that Weber had given the police a statement after being advised of his *Miranda* rights and saying that he neither had nor wanted an attorney. While this was technically accurate, it was wholly misleading insofar as it conveyed the impression that Weber knew a lawyer was there to confer with him but had rejected such counsel.

After indictment Weber moved to suppress the statement, and a hearing on the motion was deferred to the first day of trial. However, trial counsel, who do not represent Weber on this appeal, never renewed the motion or mentioned it during trial. When the statement was offered into evidence as part of the prosecution's case-in-chief, Weber's lawyer consented to its introduction. The statement was substantially identical to Weber's testimony and supported his claim of self-defense, but if that defense was rejected, it underscored the State's contention that Weber was guilty of second degree murder or manslaughter—and it was used by the prosecution for that purpose.

### A.

Relying on *Commonwealth v. McKenna*, Mass.Supr.Jud.Ct., 355 Mass. 313, 244 N.E.2d 560 (1969) and *Commonwealth v. Hilliard*, Pa.Supr., 471 Pa. 318, 370 A.2d 322 (1977), Weber now argues that the detective's failure to inform him that his attorney was at the police station waiting to see him violated his right to counsel established by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In response, the State challenges Weber's right to raise the issue here, further contending that if any error occurred, it is not "plain error".

■ When Weber's statement was offered into evidence, defense counsel's only concern was to ensure that the transcript of the statement corresponded to the tape recording from which it was made. Of course, it is well settled that the failure to object to the admission of evidence or to timely move to suppress evidence constitutes waiver of the issue for purposes of appellate review. *Brooks v. State*, Del. Supr., 229 A.2d 833, 836 (1967); Supr.Ct.R. 8; Del.R.Evid. 103(a)(1). But even if the particular issue is not raised below, this Court may reach it "when the interests of justice so require". Supr.Ct.R. 8. Weber has presented a serious issue involving the administration of justice in this State. Given the nature of his claim, coupled with the fact that a motion to suppress had been filed, we believe that the interests of justice require us to consider his arguments. *See Hughes v. State*, Del.Supr., 437 A.2d 559, 568 (1981) (en banc) (improper comments made by prosecutor in summation); *A.L.W. v. J.H.W.*, Del.Supr., 416 A.2d 708, 712 n. 6 (1980) (power of Family Court Master to enter final decree of divorce).

### B.

Weber urges that we adopt the rule of *Commonwealth v. McKenna*, Mass.Supr. Jud.Ct., 355 Mass. 313, 244 N.E.2d 560 (1969) and *Commonwealth v. Hilliard*, Pa.Supr., 471 Pa. 318, 370 A.2d 322 (1977): when a

suspect's lawyer is waiting to see him, and the police do not tell the suspect of the attorney's presence and availability, then the suspect's waiver of his right to counsel is not knowing and intelligent. The facts of *McKenna* and *Hilliard* have certain basic similarities to those here.

■ Faced with analogous circumstances, the courts of other states have reached results identical to those in *McKenna* and *Hilliard. People v. Smith,* Ill.Supr., 93 Ill.2d 179, 66 Ill.Dec. 412, 442 N.E.2d 1325, 32 Crim.L.Rep. 2045 [BNA] (Sept. 17, 1982); *State v. Matthews,* La.Supr., 408 So.2d 1274 (1982); *State v. Jackson,* La.Supr., 303 So.2d 734 (1974); *State v. Haynes,* Or.Supr., 288 Or. 59, 602 P.2d 272 (1979); *State v. Jones,* Wash.Ct.App., 19 Wash.App. 850, 578 P.2d 71 (1978). *Contra State v. Burbine,* R.I.Supr., 451 A.2d 22 (1982). The reasoning in those cases is persuasive and convinces us that the conduct of the police vitiated Weber's waiver of his right to counsel. This rendered the statement inadmissible for use in the State's case-in-chief. However, the courts that have considered this issue have reached the same result by different routes, *compare Hilliard, supra; McKenna, supra; Haynes, supra,* and we take this opportunity to state the reasoning behind our decision and the rule we establish for future cases.

Our decision is first directed toward the question of waiver. It is well known that the Supreme Court of the United States in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prescribed certain procedures that law enforcement officers must follow prior to custodial interrogation in order to inform a suspect of his rights under the fifth and fourteenth amendments. In brief, these procedures require that the suspect be advised of his right to counsel and to remain silent and that these rights may be exercised at any time. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630. Of course such rights can be waived, but because of the coercive nature of custodial interrogation the State has a "heavy burden" to show that the waiver was intel-ligently and knowingly made. *Id.* at 475, 86 S.Ct. at 1628.

■ When a suspect does not know that an attorney, who has been retained or properly designated to represent him, is actually present in the police station seeking an opportunity to render legal assistance, and the police do not inform him of that fact, there can be no intelligent and knowing waiver. *Matthews,* 408 So.2d at 1278; *Haynes,* 602 P.2d at 277. The *Miranda* warnings indicate to the suspect an abstract right to counsel, and the waiver of that right only means that for the moment the suspect is foregoing the exercise of that conceptual privilege. But that is clearly distinct from the opportunity to confer with a specifically retained or designated attorney who is actually present, seeking to render legal assistance. *Matthews,* 408 So.2d at 1278; *Haynes,* 602 P.2d at 278. We can not, and do not, conclude that a suspect, who is indifferent to the usual abstract offer of counsel, recited as part of the warnings required by *Miranda,* will disdain a chance to consult a lawyer waiting to see him then and there. *Haynes,* 602 P.2d at 278.

The rights established by *Miranda* were designed to eliminate some of the more outrageous interrogation methods employed at that time. *Miranda,* 384 U.S. at 457–58, 467, 86 S.Ct. at 1618–19, 1624. *See Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). Not only did police resort to physical violence to obtain incriminating statements, but a variety of psychological tactics were used, including isolation of the suspect and deception. *Miranda,* 384 U.S. at 445–55, 86 S.Ct. at 1612–18. To allow the police to use tactics which prevent or forestall a suspect from exercising his rights is inconsistent with the clear purpose of *Miranda. Id.* at 476, 86 S.Ct. at 1629. ("The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation."); *McKenna,* 244 N.E.2d at 567. Furthermore, the use of

such tactics is logically incongruous with the concept of a knowing and intelligent waiver:

> Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.

*Miranda,* 384 U.S. at 476, 86 S.Ct. at 1629.

■ To prevent a recurrence of this situation, effectuate the protection given to the accused by *Miranda,* and ensure that a suspect knowingly and intelligently waives his rights, we establish the following rule for the guidance of the trial court: if prior to or during custodial interrogation, and unknown to the suspect, a specifically retained or properly designated lawyer is actually present at a police station seeking an opportunity to render legal advice or assistance to the suspect, and the police intentionally or negligently fail to inform the suspect of that fact, then any statement obtained after the police themselves know of the attorney's efforts to assist the suspect, or any evidence derived from any such statement, is not admissible on any theory that the suspect intelligently and knowingly waived his right to remain silent and his right to counsel as established by *Miranda. Smith,* 66 Ill.Dec. at 416, 442 N.E.2d at 1329, 32 Crim.L.Rep. at 2046; *Matthews,* 408 So.2d at 1278; *McKenna,* 244 N.E.2d at 566–67; *Haynes,* 602 P.2d at 277. *See Hilliard,* 370 A.2d at 324; *Jones,* 578 P.2d at 73. *See also People v. Pinzon,* N.Y.Ct. App., 44 N.Y.2d 458, 406 N.Y.S.2d 268, 377 N.E.2d 721, 724–25 (1978), *quoted in*

*Haynes,* 602 P.2d at 275. Moreover, it is not essential that the police officers who may actually be interrogating a suspect know that his lawyer is present and seeks to confer with him. To effectively invoke this rule, the attorney must present himself at the police station or other site of interrogation and have a bona fide right within the ambit and limitations of the Code of Professional Responsibility to hold himself out as the suspect's counsel (see DR 2–103 and 2–104). Under such circumstances the police may not ignore or refuse to communicate with a lawyer seeking to assist his client. *Matthews,* 408 So.2d at 1278; *Jackson,* 303 So.2d at 736. This rule also applies whether the attorney was retained by the suspect or by a third party acting on behalf of or for the suspect. *E.g., McKenna,* 244 N.E.2d at 563, 564; *Hilliard,* 370 A.2d at 323; Del. Const. art. I, § 7.

While this bears some resemblance to the New York rule described in *People v. Hobson,* N.Y.Ct.App., 39 N.Y.2d 479, 384 N.Y. S.2d 419, 348 N.E.2d 894 (1976) and *People v. Arthur,* N.Y.Ct.App., 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968), under which a suspect may never waive his privilege against self-incrimination or his right to counsel in the absence of his attorney, the rule we adopt and the New York rule are distinct, and we specifically decline to adopt the latter. *Matthews,* 408 So.2d at 1278; *Haynes,* 602 P.2d at 277; *Jones,* 578 P.2d at 73. *See Burbine,* 451 A.2d at 37 (Bevilacqua, C.J., dissenting). We also reaffirm the principle that after being fully informed of the presence of counsel, a suspect may knowingly and intelligently waive his rights without consulting his attorney. *Miranda,* 384 U.S. at 478–79, 86 S.Ct. at 1629–30; *Matthews,* 408 So.2d at 1278; *Haynes,* 602 P.2d at 277; *Burbine,* 451 A.2d at 37 (Bevilacqua, C.J., dissenting). All we say here is that a suspect must be fully informed of the *actual presence and availability of counsel,* who seeks to confer with him, before any waiver of a right to remain silent or a right to counsel, as established by *Miranda,* can be considered knowing and intelligent.

## C.

This brings us to the use which the prosecution made of Weber's statement at trial. The State characterizes it as exculpatory, suggesting that its admission was harmless. We do not view it in that light. The proscription against use of statements obtained in violation of *Miranda* applies to any statement regardless of its exculpatory nature. *Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). The statement here is hardly exculpatory, since the jury could conclude from it, as the State indeed urged at trial, that Weber had committed second degree murder or manslaughter instead of acting in self-defense. *Compare Herhal v. State,* Del.Supr., 243 A.2d 703 (1968) (statement was "wholly exculpatory in nature"), *appeal after remand,* 283 A.2d 482 (1971).

Though Weber's waiver of his *Miranda* rights was invalid, the State was not precluded from using Weber's statement to impeach him when he testified. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Foraker v. State,* Del.Supr., 394 A.2d 208 (1978); *Hall v. State,* Md.Ct.App., 292 Md. 683, 441 A.2d 708 (1982). *See State v. Foraker,* Del.Super., 446 A.2d 1105 (1982). The error here was the admission of Weber's statement as part of the State's case-in-chief. That cannot be harmless error when the jury could conclude from the statement that Weber had committed murder or manslaughter instead of acting in self-defense. Given the sharply disputed testimony, we are unable to say that the evidence supporting the second degree murder conviction is so overwhelming as to make the erroneous admission of the statement harmless beyond a reasonable doubt [*Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)], or that there is no reasonable possibility the statement contributed to the conviction [*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)].

## IV.

Finally, we address the adequacy of the trial judge's instruction regarding the offense of second degree murder, and in particular, his failure to define the element of "cruel, wicked and depraved indifference to human life". See note 1, *supra.* After Weber's conviction, this Court decided *Waters v. State,* Del.Supr., 443 A.2d 500 (1982), holding that it was "plain and reversible error not to charge the jury as to the commonly accepted meaning of the brief language" of Delaware's second degree murder statute [11 *Del.C.* § 635(1)]. 443 A.2d at 506.

This is of considerable significance since the difference between second degree murder and manslaughter hangs upon the statutory language here in question. *Waters,* 443 A.2d at 506. Weber contends that the instructions were inadequate, and in light of *Waters* this is clearly so. However, the State argues that Weber failed to object to the instructions, as required by Superior Court Criminal Rule 30(a), which prevents him from raising the issue for the first time on appeal. Moreover, the State contends that *Waters* is inapplicable.

The State is correct in its observation that Weber did not object to the jury instructions. Under Superior Court Criminal Rule 30(a), that normally precludes a defendant from raising the issue here. *E.g., Goddard v. State,* Del.Supr., 382 A.2d 238 (1977). However, the doctrine of plain error allows us to consider issues not presented at trial, but which arise between trial and appeal due to intervening decisions of this Court or of the Supreme Court of the United States. *See State v. Evans,* Conn. Supr., 165 Conn. 61, 327 A.2d 576 (1973). *See also Waters,* 443 A.2d at 506 (describing error in jury instructions as "plain"). Under such circumstances the lack of an objection is not fatal to the defendant's position on appeal. *See Wiggins v. State,* Del.Supr., 210 A.2d 314, 316 (1965).

The State urges that because Weber's trial occurred in March 1981, *Waters,* which was decided in March 1982, is inapplicable.

That contention is unsupported by the language of *Waters* defining its application:

> This decision [*Waters*] will apply only to: (1) this case; (2) any case now pending on appeal to this Court; (3) any other case tried prior to March 11, 1982, which has not yet been appealed but which may be eligible for direct appeal to this Court; and (4) any trial commenced after March 11, 1982. . . .

*Waters,* 443 A.2d at 506. Weber's notice of appeal was filed on July 20, 1981. His case was therefore "pending on appeal to this Court", and *Waters* clearly is applicable. It follows that the incomplete instructions given here do not comport with *Waters* and constitute reversible error. *Id.*

### V.

If the incomplete jury instructions were the only reversible error in this case, we would permit the State to elect to modify the judgment of conviction to that of manslaughter. *See Waters v. State,* Del.Supr., 443 A.2d 500, 506 (1982). However, in view of the other errors here, the disposition that was appropriate in *Waters* is inadequate. Accordingly, we reverse Weber's convictions and remand for a new trial.

\*     \*     \*

REVERSED AND REMANDED.