IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANDREW ALLEN, | § | |
| | § | No.   54, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below:   Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID. No. 1510018545A |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:   May 12, 2021
Decided:   July 16, 2021

Before **SEITZ**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

# O R D E R

On this 16th day of July 2021, upon consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)    The defendant-appellant, Andrew Allen, appeals from a Superior Court jury verdict finding him guilty of Home Invasion, Robbery First Degree, Assault Second Degree, Burglary Second Degree, four counts of Possession of a Firearm During the Commission of a Felony, and Conspiracy Second Degree.   On appeal, Allen makes three arguments.   First, he argues that the Superior Court committed plain error by instructing the jury that evidence of the complaining witness's prior felony conviction "could be used 'solely' for general credibility, as set forth in Del. Rule of Evidence 609, precluding its use as a predicate for proof of the complainant's

bias, motive and incentive to lie, thus abridging appellant's rights to due process, confrontation and trial by jury."[1]   Second, Allen argues that the Superior Court committed plain error by not *sua sponte* "giving an instruction that, because the complainant had a penal interest in testifying favorably for the State, his testimony should be considered with great care and caution, abridging appellant's rights to due process, confrontation and trial by jury."[2]   Allen argues that the same cautionary witness instruction that is given in cases involving accomplice testimony should have been given here.   Third, Allen argues that, alternatively, the case "should be remanded for an evidentiary hearing on whether the State violated *Brady* by failing to disclose any consideration, tacit or express, given to [the complainant] in exchange for his testimony."[3]   We find no merit to Allen's claims and affirm.

(2)   On July 15, 2015, Troy Williams called the police after two men allegedly broke into his house, restrained him with duct tape, assaulted him, and robbed him.   On January 4, 2016, Allen and another person, Jeremy Clark, were indicted on the above-stated charges.[4]   Clark was tried first because Allen, although indicted, was not arrested until after Clark's trial.   Clark was tried and found not guilty on all charges.

---

[1] Appellant's Op. Br. at 13 [hereinafter OB at __].
[2] *Id.* at 23.
[3] *Id.* at 37.
[4] They were also charged with Possession of a Firearm by a Person Prohibited.   However, that charge was severed to be tried later, and, on September 25, 2019, the State entered a *nolle prosequi* on it.   App. to Appellee's Ans. Br. at B70 [hereinafter B__].

(3) The State's theory of the case was that Williams was an innocent victim. Williams testified that on July 15, 2015, between 1:00 and 1:30 p.m., there was a knock on his front door. Williams looked out his window and saw a white Chevy with New York plates across from his house. Williams then looked out his front door and saw someone wearing a blue Yankees hat holding a pizza box. Williams assumed that the person had the wrong house and opened the door. The person, brandishing a gun, tried to push into Williams's house. Williams pushed the person back outside but could not lock the door because the pizza box became jammed in the doorway. Williams continued to resist the person's entry but had trouble keeping his footing because he was wearing flip flops and pizza had spilled onto the floor. Eventually, the man in the Yankees hat and a second person forced entry into Williams's house.

(4) Once inside, the men ordered Williams to the ground. Williams complied. They taped his hands and ankles with duct tape. The man in the Yankees hat held a gun to Williams's head and the two demanded drugs and money. Williams denied having any, so one of the men hit him in the ear with a gun, causing blood to run down his face. Then, one of the men made a phone call to a third party. Williams heard the man threaten to wait until Williams's wife came home, insinuating a threat against her.

(5)     Angered, Williams decided to fight back.   He complained of being uncomfortable on the floor and asked to be helped up.    The man in the Yankees hat began picking Williams up.    Williams—who was 6 ft. 4 in. and 280 lbs.—did not help.    Instead, he slammed the man up against the wall, "flipped" his hands out of the duct tape around his wrists and "stepped out of" the duct tape around his ankles.  He grabbed the man's gun, but it would not fire.   A struggle ensued.   Williams broke free and ran up to his bedroom where he kept a revolver.    Williams retrieved his revolver and shot at the men as they retreated.    One of the bullets went into the floor at the door entryway.    Williams believed it was possible that another one of the shots hit one of the intruders.    The men got into the white Chevy with New York plates and drove away.    A third person was driving the car.

(6)     Williams called his wife and told her to come home.   He then called his friend "Al" and told him that he had just been robbed.    Next, and roughly ten to fifteen minutes after the men left, Williams called 911.

(7)     Later that day, Williams was interviewed by Detective Steven Rizzo of the Delaware State Police.   Williams told Det. Rizzo that the man in the Yankees hat was 5 ft. 10 in. tall, thin, and weighed about 180 lbs.    Williams did not tell Det. Rizzo about his revolver or that he fired it because he was afraid of getting in trouble.  Williams knew that because of a 2007 felony drug conviction he was a person prohibited from possessing a firearm.    Instead, he told Det. Rizzo that one of the

4

intruders had fired a shot into the floor as they fled. At a later interview, Det. Rizzo informed Williams that the police investigation revealed that the intruders probably had semiautomatic handguns, but ballistics evidence showed that the bullet in the floor came from a revolver. Confronted with this apparent inconsistency, Williams confessed that he shot at the men with his revolver and thought he hit one of them.

(8) At trial, defense counsel sought to undermine Williams's credibility. On cross-examination, he questioned Williams about his finances and his assets at length. Williams explained that he owned several rental properties, he and his wife owned four cars, he paid off his mortgage in five years, and he had remodeled much of his house and had a pool installed. Defense counsel used this evidence in closing argument to argue that Williams had substantially more assets than his legal income could possibly account for, implying that he was still selling drugs. On cross-examination, Williams confirmed that in 2007, he was convicted of a felony drug charge. Williams also confirmed that he was not forthcoming with police about firing his revolver because of that conviction.

(9) The jury also heard evidence obtained by the State Police during the police investigation. Detective Timothy Harach, who works in the Evidence Detection Unit, processed the crime scene. Det. Harach found pieces of duct tape on Williams's leg and wrist, on the floor in the office, and in his bedroom. There was a torn pizza box, a roll of duct tape, two nine-millimeter magazines, ear buds, a

5

piece of rope, and a cell phone that did not belong to Williams left at the scene; there were pieces of pizza inside the doorway; and there was a bullet in the floor by the front door. Fingerprints were collected from items at the scene and sent to be processed.

(10) Detective Anthony DiNardo testified that he matched one of Clark's fingerprints to a fingerprint found on a piece of duct tape and another on the roll of duct tape. Det. DiNardo also matched Allen's fingerprint to a fingerprint found on the pizza box. Det. DiNardo testified, "I'm 100 percent certain that all my identifications are a match."[5]

(11) Det. Rizzo was the case's chief investigating officer. He testified that initially Williams did not say anything about having and firing a revolver. Williams admitted to having and shooting the revolver later as discussed above. Williams also admitted that he called his friend "Al" prior to calling 911 to ask what he should do about his revolver. According to Det. Rizzo, there was no evidence of any drug dealing in Williams's house. The cell phone found in his house was determined to be Clark's. Clark's phone was turned over to the high-tech crimes unit for data extraction. The extraction report showed that Clark was in communication with Allen and two others—Gees and Sadiqq. Det. Rizzo also obtained the call detail records for Clark's phone. On the morning of the alleged

---

[5] B52.

robbery, Clark texted Gees "[t]ape and rope."[6]   Sadiqq texted Clark to "[h]andle you're [sic] business, you know what to do, you in charge."[7]   There were also several phone calls between these parties.

(12)   Special Investigator Brian Daly testified that the call detail records for Allen's phone showed that at 8:43 a.m. Allen's phone was in Philadelphia.   At 10:43 a.m. Allen's phone was hitting off a tower near Williams's house.   It continued hitting off that tower until 12:41 p.m.   At 2:49 p.m. Allen's phone started moving in a northerly direction and ended back in Philadelphia.

(13)   The defense presented the case as a drug deal gone awry.   Clark, the only defense witness, testified that at the time of the incident, he was a drug dealer. On July 15, 2015, Clark drove to Philadelphia to pick up Allen.   Clark and Allen headed to Williams's house so that Clark could purchase cocaine and introduce Allen to Williams.   According to Clark, Williams had been his cocaine supplier for about two years.   On their way to Williams's house, Williams asked Clark to pick up duct tape and rope because Williams had work to do on his rental properties. Clark explained that while speaking with Williams on his drug phone, he was making a list of the items he needed to purchase on his personal phone.   Clark

---

[6] App. to Appellant's Op. Br. at A68 [hereinafter A___].
[7] *Id.*

accidentally texted this list to his friend Gees. This was his explanation for the "tape and rope" text message.

(14) Clark and Allen arrived at Williams's house where Clark purchased cocaine. After meeting Williams but prior to the cocaine transaction, Allen left. According to Clark, while at the house, Allen moved a pizza box off Williams's desk to give Williams room to count money. This was the defense's explanation for why Allen's fingerprint was found on the pizza box.

(15) After they left, Clark and Allen drove to Chester so that Clark's uncle, Sadiqq, could cook the cocaine into crack cocaine. While in Chester, Williams called and told Clark that he needed to come back because there was a discrepancy. Clark and Allen picked up their friend Gees and drove back to Williams's house.

(16) According to Clark, he went into Williams's house alone, where Williams accused him of paying $5,000 in counterfeit money. Clark called Sadiqq and told him to bring replacement money. According to Clark, Williams became aggressive and pointed a gun at him. Clark allowed Williams to speak with Sadiqq on Clark's phone. Williams spoke to Sadiqq for a minute and then threw Clark's phone. Williams began restraining Clark with duct tape. Clark tried to fight back, so he grabbed the scale used for weighing cocaine and hit Williams in the head. A struggle ensued and Williams began duct taping Clark again.

(17)   Eventually, Clark freed himself and ran from Williams's house as Williams fired a gun at him.   Clark was shot once in his shoulder but made it to the car where Allen and Gees were waiting.   The trio drove to Temple University Hospital where Clark was treated and released.   After leaving the hospital Clark was questioned by a Philadelphia Police Officer.   Clark lied and told the officer that he was shot by a random person while walking to his friend's house.

(18)   On cross-examination, Clark again testified that when returning to Williams's house, he went in alone and was not carrying a gun.   However, Clark admitted that he was a five-time convicted felon, including several convictions for firearms-related offenses.   Clark also testified that sometime after the alleged incident he sent his then-girlfriend to pay Williams the replacement $5,000.   Clark denied that he was trying to bribe Williams.

(19)   In its rebuttal case the State offered a videotaped statement that Allen gave the State Police in July 2017.   Through that statement the State pointed out several inconsistencies between Clark and Allen's versions of what happened.

(20)   The jury found Allen guilty of all charges.

(21)   None of the claims Allen makes on appeal were raised at trial.   Where defense counsel did not object at trial to issues now raised on appeal, this Court

9

reviews for plain error.[8]   Allen concedes that his claims are reviewed for plain error.

To constitute plain error:

> [T]he error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.  Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.[9]

(22)   Allen first argues that the Superior Court committed plain error relating to the following instruction:

> Witnesses' conviction of a crime.   You may consider evidence that a witness was previously convicted of a felony or a crime involving dishonesty for the sole purpose of judging that witness's credibility or believability. Evidence of a prior conviction does not necessarily destroy or damage the witness's credibility and it does not mean the witness has testified falsely.   It is simply one of the circumstances you may consider in weighing the testimony of the witness.[10]

(23)   The alleged plain error is in the Superior Court's use of the phrase "for the sole purpose of judging that witness's credibility or believability."   Allen argues that in this case, Williams's prior conviction had relevance beyond its relevance to his general credibility.   Since Williams could potentially be prosecuted currently for his possession of the revolver as a person prohibited from possessing a

---

[8] *Small v. State*, 51 A.3d 452, 456 (Del. 2012).
[9] *Id*. (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).
[10] A146.

firearm, Allen argues, the prior conviction was also relevant to show bias, motive or an incentive to lie "stemming from a witness's potential criminal exposure that may inform his testimony, especially when the witness is testifying for the prosecuting authority that has the power to prosecute him."[11]  The instruction should have been crafted, he argues, to allow the jury to consider Williams's conviction for the specific purpose of judging his credibility, bias, motive, or incentive to lie in this case.  The instruction as given, so the argument goes, did not permit the jury to use the prior conviction for this wider purpose.

(24)  Allen gives us three cases, *Davis v. Alaska*, *Weber v. State*, and *Reid v. State*, which he contends support his position.  We will describe these three cases, and then turn to Allen's argument.  In *Davis v. Alaska*, a United States Supreme Court case, the question presented was:

> [W]hether the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as [a] juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency.[12]

A juvenile was a crucial witness for the State.  The juvenile was on probation for a delinquency adjudication.  The defendant sought to introduce, by way of

---

[11] OB at 16.
[12] 415 U.S. 308, 309 (1974).

11

cross-examination, evidence of the juvenile's prior juvenile record to show that the witness acted out of fear of possible legal jeopardy or to shift suspicion away from himself. The State argued that a juvenile's delinquency and probationary status were confidential and should not be admitted. The trial court ruled in favor of the State and the juvenile's delinquency record and probationary status were not admitted. The Supreme Court reversed, holding that the defendant's Sixth Amendment Right to Confrontation was violated:

> While counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. . . On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination[.][13]

(25) In *Weber v. State*, a murder case, it was revealed during trial that family members of the victim had made payments of money to several State witnesses.[14] The family members claimed that the payments were made for the witnesses to buy new clothes to wear at trial. The defense attorney argued that the payments should be admitted into evidence because they were essential to the jury's assessment of the

---

[13] *Id.* at 318.
[14] 457 A.2d 674, 678 (Del. 1983).

witnesses' character and credibility. The trial court refused to admit the evidence on the ground that there was no difference between the witnesses' trial testimony and their prior statements to the police. On appeal, the defendant argued that he was denied his constitutional right to impeach the credibility of the witnesses, citing *Davis v. Alaska*. This Court reversed and held that the lower court violated the defendant's confrontation rights by preventing him from impeaching the witnesses' credibility with evidence of bias.

(26) In *Reid v. State*, the issue was whether the trial court committed reversible error by refusing to allow the defendant to use a witness's juvenile adjudication of delinquency for impeachment purposes on cross-examination.[15] This Court's order on appeal focused on D.R.E. 609(d), which specifically governs the admissibility of juvenile adjudications, and the Confrontation Clause. Rule 609(d) provides that evidence of juvenile adjudications is generally not admissible under Rule 609. Rule 609(d) further provides, however, that a juvenile adjudication may be admitted if it would be admissible "to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence."[16] The Court took the opportunity the case presented to discuss the analysis necessary to address a defendant's claim that the

---

[15] 2005 WL 3272134, at *2 (Del. Nov. 30, 2005).
[16] D.R.E. 609(d).

Confrontation Clause entitles him to cross-examine a State's witness about an adjudication of delinquency:

> Reviewing these cases, it is apparent that when a trial judge is called upon to balance the Confrontation Clause and Rule 609(d), he should ask whether the impeachment evidence of earlier juvenile adjudications of delinquency is (1) offered to show bias (i.e., the motive to lie in the specific case) and (2) important to the assertion of that bias. This second prong tracks the explicit requirement of Rule 609(d) that evidence be "necessary for a fair determination of the issues of guilt or innocence." In other words, the Confrontation Clause does not mandate a right to use juvenile adjudications of delinquency for general impeachment. The confrontation clause is implicated only where impeachment is used to establish specific bias. The party offering the evidence should have the burden of showing that the exception to impeachment evidence is necessary for a fair determination of the issue of guilt or innocence.[17]

The Court recognized in *Reid* a distinction between evidence offered under Rule 609 to undermine credibility in a general sense by showing a witness's criminal character, and evidence which shows a bias or motive to lie on the facts and circumstances of a specific case. The Court held that the Confrontation Clause was not violated on the facts of that case because the defendant sought only to introduce the witness's juvenile record for general impeachment, not for allegations of specific bias.

---

[17] 2005 WL 3272134, at *4 (citations and footnotes omitted).

14

(27) Under D.R.E. 609, evidence that a witness has been convicted of a felony can be admitted for the purpose of attacking the credibility of the witness.[18] The instruction given in this case is a Superior Court pattern instruction. Allen concedes that it is, in fact, a correct statement of the law as applied to Clark as a witness. Relying on the case law discussed above, however, Allen argues that the instruction should have been rewritten *sua sponte* by the court to instruct the jury that Williams's conviction should have been considered not only as it pertained to his general credibility, but also as it pertained to his specific bias, motive, and incentive to lie in this case.

(28) In addition to the Rule 609 pattern instruction, the jury was given a pattern instruction on credibility of witnesses, which reads as follows:

> Credibility of witnesses. You are the sole judges of the credibility of each witness. You decide the weight to be given to each witness's testimony. You should consider each witness's means of knowledge, strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the consistencies or inconsistency of the testimony; the motivations of the witness; whether the testimony has been contradicted; the bias, prejudice or interest of the witness, if any; the manner or demeanor of the witness of the witness [sic] upon the witness stand; and all other facts and circumstances shown by the evidence that effect the credibility of the testimony.[19]

---

[18] D.R.E. 609(a).
[19] A146.

15

(29) While the instruction on a witness's conviction of a crime instructs the jury to consider the witness's conviction for the sole purpose of judging a witness's credibility, the instruction on witness credibility explains how the jury may go about judging credibility. It informs the jury that judging credibility may include an assessment of a witness's motivation, bias, prejudice, and interest. The two instructions, taken together, plainly gave the jury full range to consider whether Williams's prior felony conviction gave him a motive or incentive to make up a story which portrayed him as the victim in an attempt to shift law enforcement's attention away from prosecting him for possessing a firearm.

(30) The three cases raised by Allen are distinguishable and inapplicable. In all three cases, the trial judge prevented a defendant from cross-examining a witness with evidence that would undermine the witness's credibility or show the witness's bias. None of the cases have anything to do with jury instructions. In this case, no evidence relevant to this appeal was excluded. The trial record reflects that Allen's counsel thoroughly cross-examined Williams. On cross-examination, defense counsel presented evidence of Williams's prior drug felony conviction, his finances and assets, his previous lie to police, and his illegal possession and use of his firearm. Therefore, Allen's counsel had the opportunity to—and did—present evidence that allowed the jury to assess Williams's general credibility and any bias, motive, and incentive to be untruthful in this specific case. Plain error is limited to

16

defects which are apparent on the face of the record.    Giving the witnesses' conviction of a crime instruction in its pattern form was not plain error.

(31)    Allen's second argument is that the Superior Court erred by not giving an instruction that Williams's testimony should be viewed with caution.    Such an instruction was necessary, Allen argues, because Williams had a motive to falsely accuse him in an effort to avoid being prosecuted himself for possession of a firearm by a person prohibited.    He points to *Bland v. State* and *Brooks v. State*, cases concerning accomplice testimony.    In *Brooks*, this Court established the rule that when a witness who claims to have been the defendant's accomplice testifies, the trial judge's failure to give an accomplice testimony instruction, even if not requested by the defendant, is plain error.    The instruction informs the jury that the testimony of an alleged accomplice should be viewed with more care and caution than a witness who did not participate in the crime.    Allen argues that the legal analysis requiring the giving of an accomplice testimony instruction is applicable to any interested testimony, such as Williams's testimony in this case.    He also brings to our attention a pattern instruction from New Jersey titled "Testimony of a Cooperating Co-Defendant or Witness," which can be given any time a witness has a motive to curry favor with the State, including when a witness may be facing potential charges.[20]    He also mentions a Third Circuit model criminal jury

---

[20] OB at 28.

17

instruction for a "witness who has pleaded guilty to [a] same or related offense, accomplices, immunized witnesses, [or] cooperating witnesses."[21]

(32) In this state, the giving of a cautionary instruction for specific witness testimony has not been extended beyond the witness who claims to have been an accomplice of the defendant. It was not plain error for the trial judge in this case not to have given such an instruction. Allen's second argument is rejected.

(33) Allen's third argument is that, "[a]lternatively, this case should be remanded for an evidentiary hearing on whether the State violated *Brady* by failing to disclose any consideration, tacit or express, given to Williams in exchange for his testimony."[22] Allen argues that, because Williams admitted to police that he illegally possessed a revolver and shot one of the assailants but was not prosecuted, "it is utterly improbable that no one made the decision not to prosecute."[23] These facts demonstrate, Allen argues, "the overwhelming likelihood that Williams' received an undisclosed deal in this case, and thus supports granting a hearing on this claim."[24] Allen concedes that this claim is also reviewed for plain error because it was not preserved below.

---

[21] *Id.*
[22] *Id.* at 37.
[23] *Id.* at 38.
[24] *Id.*

18

(34) The State contends that Allen's argument is mere speculation and does not amount to plain error, as the record is devoid of any evidence to substantiate his *Brady* allegation. We agree. Allen cannot make any showing of a *Brady* violation. The record contains no evidence that Williams was given any consideration for his testimony. There is no plain error here.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:

/s/ James T. Vaughn, Jr.
Justice